# UNITED STATES *v.* WONG KIM ARK.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR
THE NORTHERN DISTRICT OF CALIFORNIA.

No. 182. Argued March 5, 8, 1897. — Decided March 28, 1898.

A child born in the United States, of parents of Chinese descent, who, at the
time of his birth, are subjects of the Emperor of China, but have a per-
manent domicil and residence in the United States, and are there carrying
on business, and are not employed in any diplomatic or official capacity
under the Emperor of China, becomes at the time of his birth a citizen
of the United States, by virtue of the first clause of the Fourteenth
Amendment of the Constitution, " All persons born or naturalized in the
United States, and subject to the jurisdiction thereof, are citizens of
the United States and of the State wherein they reside."

THIS was a writ of *habeas corpus,* issued October 2, 1895, by
the District Court of the United States for the Northern
District of California, to the collector of customs at the port
of San Francisco, in behalf of Wong Kim Ark, who alleged
that he was a citizen of the United States, of more than
twenty-one years of age, and was born at San Francisco in
1873 of parents of Chinese descent and subjects of the Emperor
of China, but domiciled residents at San Francisco; and that,
on his return to the United States on the steamship Coptic in
August, 1895, from a temporary visit to China, he applied to
said collector of customs for permission to land, and was by
the collector refused such permission, and was restrained of
his liberty by the collector, and by the general manager of
the steamship company acting under his direction, in violation
of the Constitution and laws of the United States, not by
virtue of any judicial order or proceeding, but solely upon the
pretence that he was not a citizen of the United States.

At the hearing, the District Attorney of the United States
was permitted to intervene in behalf of the United States in
opposition to the writ, and stated the grounds of his inter-
vention in writing as follows:

" That, as he is informed and believes, the said person in

whose behalf said application was made is not entitled to land in the United States, or to be or remain therein, as is alleged in said application, or otherwise.

"Because the said Wong Kim Ark, although born in the city and county of San Francisco, State of California, United States of America, is not, under the laws of the State of California and of the United States, a citizen thereof, the mother and father of the said Wong Kim Ark being Chinese persons and subjects of the Emperor of China, and the said Wong Kim Ark being also a Chinese person and a subject of the Emperor of China.

"Because the said Wong Kim Ark has been at all times, by reason of his race, language, color and dress, a Chinese person, and now is, and for some time last past has been, a laborer by occupation.

"That the said Wong Kim Ark is not entitled to land in the United States, or to be or remain therein, because he does not belong to any of the privileged classes enumerated in any of the acts of Congress, known as the Chinese Exclusion Acts,[1] which would exempt him from the class or classes which are especially excluded from the United States by the provisions of the said acts.

"Wherefore the said United States Attorney asks that a judgment and order of this honorable court be made and entered in accordance with the allegations herein contained, and that the said Wong Kim Ark be detained on board of said vessel until released as provided by law, or otherwise to be returned to the country from whence he came, and that such further order be made as to the court may seem proper and legal in the premises."

The case was submitted to the decision of the court upon the following facts agreed by the parties:

"That the said Wong Kim Ark was born in the year 1873, at No. 751 Sacramento Street, in the city and county of San Francisco, State of California, United States of America, and

---

[1] Acts of May 6, 1882, c. 126, 22 Stat. 58; July 5, 1884, c. 220, 23 Stat. 115; September 13, 1888, c. 1015, and October 1, 1888, c. 1064, 25 Stat. 476, 504; May 5, 1892, c. 60, 27 Stat. 25; August 18, 1894, c. 301, 28 Stat. 390.

that his mother and father were persons of Chinese descent and subjects of the Emperor of China, and that said Wong Kim Ark was and is a laborer.

"That at the time of his said birth his mother and father were domiciled residents of the United States, and had established and enjoyed a permanent domicil and residence therein at said city and county of San Francisco, State aforesaid.

"That said mother and father of said Wong Kim Ark continued to reside and remain in the United States until the year 1890, when they departed for China.

"That during all the time of their said residence in the United States as domiciled residents therein the said mother and father of said Wong Kim Ark were engaged in the prosecution of business, and were never engaged in any diplomatic or official capacity under the Emperor of China.

"That ever since the birth of said Wong Kim Ark, at the time and place hereinbefore stated and stipulated, he has had but one residence, to wit, a residence in said State of California, in the United States of America, and that he has never changed or lost said residence or gained or acquired another residence, and there resided claiming to be a citizen of the United States.

"That in the year 1890 the said Wong Kim Ark departed for China upon a temporary visit and with the intention of returning to the United States, and did return thereto on July 26, 1890, on the steamship Gælic, and was permitted to enter the United States by the collector of customs upon the sole ground that he was a native-born citizen of the United States.

"That after his said return the said Wong Kim Ark remained in the United States, claiming to be a citizen thereof, until the year 1894, when he again departed for China upon a temporary visit, and with the intention of returning to the United States, and did return thereto in the month of August, 1895, and applied to the collector of customs to be permitted to land; and that such application was denied upon the sole ground that said Wong Kim Ark was not a citizen of the United States.

"That said Wong Kim Ark has not, either by himself or his parents acting for him, ever renounced his allegiance to the United States, and that he has never done or committed any act or thing to exclude him therefrom."

The court ordered Wong Kim Ark to be discharged, upon the ground that he was a citizen of the United States.  71 Fed. Rep. 382.  The United States appealed to this court, and the appellee was admitted to bail pending the appeal.

*Mr. Solicitor General Conrad,* with whom was *Mr. George D. Collins* on the brief, for appellants.

*Mr. Maxwell Evarts* and *Mr. J. Hubley Ashton,* for appellee. *Mr. Thomas D. Riordan* filed a brief for same.

MR. JUSTICE GRAY, after stating the case, delivered the opinion of the court.

The facts of this case, as agreed by the parties, are as follows: Wong Kim Ark was born in 1873 in the city of San Francisco, in the State of California and United States of America, and was and is a laborer.  His father and mother were persons of Chinese descent, and subjects of the Emperor of China; they were at the time of his birth domiciled residents of the United States, having previously established and still enjoying a permanent domicil and residence therein at San Francisco; they continued to reside and remain in the United States until 1890, when they departed for China; and during all the time of their residence in the United States they were engaged in business, and were never employed in any diplomatic or official capacity under the Emperor of China. Wong Kim Ark, ever since his birth, has had but one residence, to wit, in California, within the United States, and has there resided, claiming to be a citizen of the United States, and has never lost or changed that residence, or gained or acquired another residence; and neither he, nor his parents acting for him, ever renounced his allegiance to the United States, or did or committed any act or thing to exclude him

therefrom. In 1890 (when he must have been about seventeen years of age) he departed for China on a temporary visit and with the intention of returning to the United States, and did return thereto by sea in the same year, and was permitted by the collector of customs to enter the United States, upon the sole ground that he was a native-born citizen of the United States. After such return, he remained in the United States, claiming to be a citizen thereof, until 1894, when he (being about twenty-one years of age, but whether a little above or a little under that age does not appear) again departed for China on a temporary visit and with the intention of returning to the United States; and he did return thereto by sea in August, 1895, and applied to the collector of customs for permission to land; and was denied such permission, upon the sole ground that he was not a citizen of the United States.

It is conceded that, if he is a citizen of the United States, the acts of Congress, known as the Chinese Exclusion Acts, prohibiting persons of the Chinese race, and especially Chinese laborers, from coming into the United States, do not and cannot apply to him.

The question presented by the record is whether a child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, but have a permanent domicil and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity under the Emperor of China, becomes at the time of his birth a citizen of the United States, by virtue of the first clause of the Fourteenth Amendment of the Constitution, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

I. In construing any act of legislation, whether a statute enacted by the legislature, or a constitution established by the people as the supreme law of the land, regard is to be had, not only to all parts of the act itself, and of any former act of the same law-making power, of which the act in question is an amendment; but also to the condition, and to the history,

of the law as previously existing, and in the light of which the new act must be read and interpreted.

The Constitution of the United States, as originally adopted, uses the words "citizen of the United States," and "natural-born citizen of the United States." By the original Constitution, every representative in Congress is required to have been "seven years a citizen of the United States," and every Senator to have been "nine years a citizen of the United States;" and "no person except a natural-born citizen, or a citizen of the United States at the time of the adoption of this Constitution, shall be eligible to the office of President." The Fourteenth Article of Amendment, besides declaring that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside," also declares that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." And the Fifteenth Article of Amendment declares that "the right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any State, on account of race, color or previous condition of servitude."

The Constitution nowhere defines the meaning of these words, either by way of inclusion or of exclusion, except in so far as this is done by the affirmative declaration that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States." In this, as in other respects, it must be interpreted in the light of the common law, the principles and history of which were familiarly known to the framers of the Constitution. *Minor* v. *Happersett,* 21 Wall. 162; *Ex parte Wilson,* 114 U. S. 417, 422; *Boyd* v. *United States,* 116 U. S. 616, 624, 625; *Smith* v. *Alabama,* 124 U. S. 465. The language of the Constitution, as has been well said, could not be understood without reference to the common law. 1 Kent Com. 336; Bradley, J., in *Moore* v. *United States,* 91 U. S. 270, 274.

In *Minor* v. *Happersett,* Chief Justice Waite, when construing, in behalf of the court, the very provision of the Fourteenth Amendment now in question, said: ".The Constitution does not, in words, say who shall be natural-born citizens. Resort must be had elsewhere to ascertain that." And he proceeded to resort to the common law as an aid in the construction of this provision. 21 Wall. 167.

In *Smith* v. *Alabama,* Mr. Justice Matthews, delivering the judgment of the court, said : " There is no common law of the United States, in the sense of a national customary law, distinct from the common law of England as adopted by the several States each for itself, applied as its local law, and subject to such alteration as may be provided by its own statutes." " There is, however, one clear exception to the statement that there is no national common law. The interpretation of the Constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history." 124 U. S. 478.

II. The fundamental principle of the common law with regard to English nationality was birth within the allegiance, also called "ligealty," "obedience," "faith" or "power," of the King. The principle embraced all persons born within the King's allegiance and subject to his protection. Such allegiance and protection were mutual — as expressed in the maxim, *protectio trahit subjectionem, et subjectio protectionem* — and were not restricted to natural-born subjects and naturalized subjects, or to those who had taken an oath of allegiance; but were predicable of aliens in amity, so long as they were within the kingdom. Children, born in England, of such aliens, were therefore natural-born subjects. But the children, born within the realm, of foreign ambassadors, or the children of alien enemies, born during and within their hostile occupation of part of the King's dominions, were not natural-born subjects, because not born within the allegiance, the obedience, or the power, or, as would be said at this day, within the jurisdiction of the King.

This fundamental principle, with these qualifications or

explanations of it, was clearly, though quaintly, stated in the leading case, known as *Calvin's Case*, or the *Case of the Postnati*, decided in 1608, after a hearing in the Exchequer Chamber before the Lord Chancellor and all the Judges of England, and reported by Lord Coke and by Lord Ellesmere. *Calvin's Case*, 7 Rep. 1, 4*b*–6*a*, 18*a*, 18*b*; Ellesmere on Postnati, 62–64; *S. C.*, 2 Howell's State Trials, 559, 607, 613–617, 639, 640, 659, 679.

The English authorities ever since are to the like effect. Co. Lit. 8*a*, 128*b*; Lord Hale, in Hargrave's Law Tracts, 210, and in 1 Hale P. C. 61, 62; 1 Bl. Com. 366, 369, 370, 374; 4 Bl. Com. 74, 92; Lord Kenyon, in *Doe* v. *Jones*, 4 T. R. 300, 308; Cockburn on Nationality, 7; Dicey Conflict of Laws, pp. 173–177, 741.

In *Udny* v. *Udny*, (1869) L. R. 1 H. L. Sc. 441, the point decided was one of inheritance, depending upon the question whether the domicil of the father was in England or in Scotland, he being in either alternative a British subject. Lord Chancellor Hatherley said: "The question of naturalization and of allegiance is distinct from that of domicil." p. 452. Lord Westbury, in the passage relied on by the counsel for the United States, began by saying: "The law of England, and of almost all civilized countries, ascribes to each individual at his birth two distinct legal states or conditions: one, by virtue of which he becomes the subject of some particular country, binding him by the tie of natural allegiance, and which may be called his political status; another, by virtue of which he has ascribed to him the character of a citizen of some particular country, and as such is possessed of certain municipal rights, and subject to certain obligations, which latter character is the civil status or condition of the individual, and may be quite different from his political status." And then, while maintaining that the civil status is universally governed by the single principle of domicil, *domicilium*, the criterion established by international law for the purpose of determining civil status, and the basis on which " the personal rights of the party, that is to say, the law which determines his majority or minority, his marriage, succession, testacy or in-

testacy, must depend;" he yet distinctly recognized that a man's political status, his country, *patria,* and his "nationality, that is, natural allegiance," "may depend on different laws in different countries." pp. 457, 460. He evidently used the word "citizen," not as equivalent to "subject," but rather to "inhabitant;" and had no thought of impeaching the established rule that all persons born under British dominion are natural-born subjects.

Lord Chief Justice Cockburn, in the same year, reviewing the whole matter, said : "By the common law of England, every person born within the dominions of the Crown, no matter whether of English or of foreign parents, and, in the latter case, whether the parents were settled, or merely temporarily sojourning, in the country, was an English subject; save only the children of foreign ambassadors (who were excepted because their fathers carried their own nationality with them), or a child born to a foreigner during the hostile occupation of any part of the territories of England. No effect appears to have been given to descent as a source of nationality." Cockburn on Nationality, 7.

Mr. Dicey, in his careful and thoughtful Digest of the Law of England with reference to the Conflict of Laws, published in 1896, states the following propositions, his principal rules being printed below in italics : " '*British subject*' means any *person who owes permanent allegiance to the Crown.* 'Permanent' allegiance is used to distinguish the allegiance of a British subject from the allegiance of an alien who, because he is within the British dominions, owes 'temporary' allegiance to the Crown. '*Natural-born British subject*' means a *British subject who has become a British subject at the moment of his birth.*" "*Subject to the exceptions hereinafter mentioned, any person who (whatever the nationality of his parents) is born within the British dominions is a natural-born British subject.* This rule contains the leading principle of English law on the subject of British nationality." The exceptions afterwards mentioned by Mr. Dicey are only these two : "1. Any person who (his father being an alien enemy) is born in a part of the British dominions, which at the time of such

person's birth is in hostile occupation, is an alien." "2. Any person whose father (being an alien) is at the time of such person's birth an ambassador or other diplomatic agent accredited to the Crown by the Sovereign of a foreign State is (though born within the British dominions) an alien." And he adds: "The exceptional and unimportant instances in which birth within the British dominions does not of itself confer British nationality are due to the fact that, though at common law nationality or allegiance in substance depended on the place of a person's birth, it in theory at least depended, not upon the locality of a man's birth, but upon his being born within the jurisdiction and allegiance of the King of England; and it might occasionally happen that a person was born within the dominions without being born within the allegiance, or, in other words, under the protection and control of the Crown." Dicey Conflict of Laws, pp. 173–177, 741.

It thus clearly appears that by the law of England for the last three centuries, beginning before the settlement of this country, and continuing to the present day, aliens, while residing in the dominions possessed by the Crown of England, were within the allegiance, the obedience, the faith or loyalty, the protection, the power, the jurisdiction, of the English Sovereign; and therefore every child born in England of alien parents was a natural-born subject, unless the child of an ambassador or other diplomatic agent of a foreign State, or of an alien enemy in hostile occupation of the place where the child was born.

III. The same rule was in force in all the English Colonies upon this continent down to the time of the Declaration of Independence, and in the United States afterwards, and continued to prevail under the Constitution as originally established.

In the early case of *The Charming Betsy*, (1804) it appears to have been assumed by this court that all persons born in the United States were citizens of the United States; Chief Justice Marshall saying: "Whether a person born within the United States, or becoming a citizen according to the established laws of the country, can divest himself absolutely of

that character otherwise than in such manner as may be prescribed by law, is a question which it is not necessary at present to decide." 2 Cranch, 64, 119.

In *Inglis* v. *Sailors' Snug Harbor*, (1830) 3 Pet. 99, in which the plaintiff was born in the city of New York, about the time of the Declaration of Independence, the justices of this court (while differing in opinion upon other points) all agreed that the law of England as to citizenship by birth was the law of the English Colonies in America. Mr. Justice Thompson, speaking for the majority of the court, said: "It is universally admitted, both in the English courts and in those of our own country, that all persons born within the Colonies of North America, whilst subject to the Crown of Great Britain, were natural-born British subjects." 3 Pet. 120. Mr. Justice Johnson said: "He was entitled to inherit as a citizen born of the State of New York." 3 Pet. 136. Mr. Justice Story stated the reasons upon this point more at large, referring to *Calvin's Case*, Blackstone's Commentaries, and *Doe* v. *Jones*, above cited, and saying: "Allegiance is nothing more than the tie or duty of obedience of a subject to the sovereign under whose protection he is; and allegiance by birth is that which arises from being born within the dominions and under the protection of a particular sovereign. Two things usually concur to create citizenship: First, birth locally within the dominions of the sovereign; and, secondly, birth within the protection and obedience, or, in other words, within the ligeance of the sovereign. That is, the party must be born within a place where the sovereign is at the time in full possession and exercise of his power, and the party must also at his birth derive protection from, and consequently owe obedience or allegiance to, the sovereign, as such, *de facto*. There are some exceptions which are founded upon peculiar reasons, and which, indeed, illustrate and confirm the general doctrine. Thus, a person who is born on the ocean is a subject of the prince to whom his parents then owe allegiance; for he is still deemed under the protection of his sovereign, and born in a place where he has dominion in common with all other sovereigns. So the children of an ambassador are held to be

subjects of the prince whom he represents, although born under the actual protection and in the dominions of a foreign prince." 3 Pet. 155. "The children of enemies, born in a place within the dominions of another sovereign, then occupied by them by conquest, are still aliens." 3 Pet. 156. "Nothing is better settled at the common law than the doctrine that the children, even of aliens, born in a country, while the parents are resident there under the protection of the government, and owing a temporary allegiance thereto, are subjects by birth." 3 Pet. 164.

In *Shanks* v. *Dupont*, 3 Pet. 242, decided (a appears by the records of this court) on the same day as the ast case, it was held that a woman born in South Carolina before the Declaration of Independence, married · to an English officer in Charleston during its occupation by the British forces in the Revolutionary War, and accompanying her husband on his return to England, and there remaining until her death, was a British subject, within the meaning of the Treaty of Peace of 1783, so that her title to land in South Carolina, by descent cast before that treaty, was protected thereby. It was of such a case, that Mr. Justice Story, delivering the opinion of the court, said: "The incapacities of femes covert, provided by the common law, apply to their civil rights, and are for their protection and interest. But they do not reach their political rights, nor prevent their acquiring or losing a national character. Those political rights do not stand upon the mere doctrines of municipal law, applicable to ordinary transactions, but stand upon the more general principles of the law of nations." 3 Pet. 248. This last sentence was relied on by the counsel for the United States, as showing that the question whether a person is a citizen of a particular country is to be determined, not by the law of that country, but by the principles of international law. But Mr. Justice Story certainly did not mean to suggest that, independently of treaty, there was any principle of international law which could defeat the operation of the established rule of citizenship by birth within the United States; for he referred (p. 245) to the contemporaneous opinions in *Inglis* v. *Sailors' Snug Harbor*,

above cited, in which this rule had been distinctly recognized, and in which he had said (p. 162) that "each government had a right to decide for itself who should be admitted or deemed citizens;" and in his Treatise on the Conflict of Laws, published in 1834, he said that, in respect to residence in different countries or sovereignties, "there are certain principles which have been generally recognized, by tribunals administering public law, [adding, in later editions, "or the law of nations,"] as of unquestionable authority," and stated, as the first of those principles, "Persons who are born in a country are generally deemed citizens and subjects of that country." Story Conflict of Laws, § 48.

The English statute of 11 & 12 Will. III, (1700) c. 6, entitled "An act to enable His Majesty's natural-born subjects to inherit the estate of their ancestors, either lineal or collateral, notwithstanding their father or mother were aliens," enacted that "all and every person or persons, being the King's natural-born subject or subjects, within any of the King's realms or dominions," might and should thereafter lawfully inherit and make their titles by descent to any lands "from any of their ancestors, lineal or collateral, although the father and mother, or father or mother, or other ancestor, of such person or persons, by, from, through or under whom" title should be made or derived, had been or should be "born out of the King's allegiance, and out of His Majesty's realms and dominions," as fully and effectually, as if such parents or ancestors "had been naturalized or natural-born subject or subjects within the King's dominions." 7 Statutes of the Realm, 590. It may be observed that, throughout that statute, persons born within the realm, although children of alien parents, were called "natural-born subjects." As that statute included persons born "within any of the King's realms or dominions," it of course extended to the Colonies, and, not having been repealed in Maryland, was in force there. In *McCreery* v. *Somerville*, (1824) 9 Wheat. 354, which concerned the title to land in the State of Maryland, it was assumed that children born in that State of an alien who was still living, and who had not been naturalized, were "native-born citizens of the

United States ;" and without such assumption the case would
not have presented the question decided by the court, which,
as stated by Mr. Justice Story in delivering the opinion, was
"whether the statute applies to the case of a living alien an-
cestor, so as to create a title by heirship, where none would
exist by the common law, if the ancestor were a natural-born
subject." 9 Wheat. 356.

Again, in *Levy* v. *McCartee*, (1832) 6 Pet. 102, 112, 113, 115,
which concerned a descent cast since the American Revolu-
tion, in the State of New York, where the statute of 11 & 12
Will. III had been repealed, this court, speaking by Mr. Justice
Story, held that the case must rest for its decision exclusively
upon the principles of the common law; and treated it as
unquestionable that by that law a child born in England of
alien parents was a natural-born subject; quoting the state-
ment of Lord Coke in Co. Lit. 8*a*, that "if an alien cometh
into England and hath issue two sons, these two sons are
*indigenæ*, subjects born, because they are born within the
realm;" and saying that such a child "was a native-born sub-
ject, according to the principles of the common law, stated by
this court in *McCreery* v. *Somerville*, 9 Wheat. 354."

In *Dred Scott* v. *Sandford*, (1857) 19 How. 393, Mr. Justice
Curtis said: "The first section of the second article of the
Constitution uses the language, 'a natural-born citizen.' It
thus assumes that citizenship may be acquired by birth. Un-
doubtedly, this language of the Constitution was used in refer-
ence to that principle of public law, well understood in this
country at the time of the adoption of the Constitution, which
referred citizenship to the place of birth." 19 How. 576.
And to this extent no different opinion was expressed or inti-
mated by any of the other judges.

In *United States* v. *Rhodes*, (1866) Mr. Justice Swayne, sit-
ting in the Circuit Court, said: "All persons born in the alle-
giance of the King are natural-born subjects, and all persons
born in the allegiance of the United States are natural-born
citizens. Birth and allegiance go together. Such is the rule
of the common law, and it is the common law of this country,
as well as of England." "We find no warrant for the opinion

that this great principle of the common law has ever been changed in the United States. It has always obtained here with the same vigor, and subject only to the same exceptions, since as before the Revolution." 1 Abbott (U. S.) 28, 40, 41.

The Supreme Judicial Court of Massachusetts, speaking by Mr. Justice (afterwards Chief Justice) Sewall, early held that the determination of the question whether a man was a citizen or an alien was "to be governed altogether by the principles of the common law," and that it was established, with few exceptions, "that a man, born within the jurisdiction of the common law, is a citizen of the country wherein he is born. By this circumstance of his birth, he is subjected to the duty of allegiance which is claimed and enforced by the sovereign of his native land; and becomes reciprocally entitled to the protection of that sovereign, and to the other rights and advantages which are included in the term 'citizenship.'" *Gardner* v. *Ward*, (1805) 2 Mass. 244, note. And again: "The doctrine of the common law is, that every man born within its jurisdiction is a subject of the sovereign of the country where he is born; and allegiance is not personal to the sovereign in the extent that has been contended for; it is due to him in his political capacity of sovereign of the territory where the person owing the allegiance was born." *Kilham* v. *Ward*, (1806) 2 Mass. 236, 265. It may here be observed that in a recent English case Lord Coleridge expressed the opinion of the Queen's Bench Division that the statutes of 4 Geo. II, (1731) c. 21, and 13 Geo. III, (1773) c. 21, (hereinafter referred to,) "clearly recognize that to the King in his politic, and not in his personal capacity, is the allegiance of his subjects due." *Isaacson* v. *Durant*, 17 Q. B. D. 54, 65.

The Supreme Court of North Carolina, speaking by Mr. Justice Gaston, said: "Before our Revolution, all free persons born within the dominions of the King of Great Britain, whatever their color or complexion, were native-born British subjects; those born out of his allegiance were aliens." "Upon the Revolution, no other change took place in the law of North Carolina, than was consequent upon the transition from a colony dependent on an European King to a free and sov-

ereign State;" "British subjects in North Carolina became North Carolina freemen;" "and all free persons born within the State are born citizens of the State." "The term 'citizen,' as understood in our law, is precisely analogous to the term 'subject' in the common law, and the change of phrase has entirely resulted from the change of government. The sovereignty has been transferred from one man to the collective body of the people; and he who before was a 'subject of the king' is now 'a citizen of the State.'" *State* v. *Manuel*, (1838) 4 Dev. & Bat. 20, 24–26.

That all children, born within the dominion of the United States, of foreign parents holding no diplomatic office, became citizens at the time of their birth, does not appear to have been contested or doubted until more than fifty years after the adoption of the Constitution, when the matter was elaborately argued in the Court of Chancery of New York, and decided upon full consideration by Vice Chancellor Sandford in favor of their citizenship. *Lynch* v. *Clarke*, (1844) 1 Sandf. Ch. 583.

The same doctrine was repeatedly affirmed in the executive departments, as, for instance, by Mr. Marcy, Secretary of State, in 1854, 2 Whart. Int. Dig. (2d ed.) p. 394; by Attorney General Black in 1859, 9 Opinions, 373; and by Attorney General Bates in 1862, 10 Opinions, 328, 382, 394, 396.

Chancellor Kent, in his Commentaries, speaking of the "general division of the inhabitants of every country, under the comprehensive title of aliens and natives," says: "Natives are all persons born within the jurisdiction and allegiance of the United States. This is the rule of the common law, without any regard or reference to the political condition or allegiance of their parents, with the exception of the children of ambassadors, who are in theory born within the allegiance of the foreign power they represent." "To create allegiance by birth, the party must be born, not only within the territory, but within the ligeance of the government. If a portion of the country be taken and held by conquest in war, the conqueror acquires the rights of the conquered as to its dominion and government, and children born in the armies of a State, while

abroad and occupying a foreign country, are deemed to be born in the allegiance of the sovereign to whom the army belongs. It is equally the doctrine of the English common law, that during such hostile occupation of a territory, and the parents be adhering to the enemy as subjects *de facto*, their children, born under such a temporary dominion, are not born under the ligeance of the conquered." 2 Kent Com. (6th ed.) 39, 42. And he elsewhere says: " And if, at common law, all human beings born within the ligeance of the King, and under the King's obedience, were natural-born subjects, and not aliens, I do not perceive why this doctrine does not apply to these United States, in all cases in which there is no express constitutional or statute declaration to the contrary." " Subject and citizen are, in a degree, convertible terms as applied to natives ; and though the term *citizen* seems to be appropriate to republican freemen, yet we are, equally with the inhabitants of all other countries, *subjects*, for we are equally bound by allegiance and subjection to the government and law of the land." 2 Kent Com. 258, note.

Mr. Binney, in the second edition of a paper on the Alienigenæ of the United States, printed in pamphlet at Philadelphia, with a preface bearing his signature and the date of December 1, 1853, said: " The common law principle of allegiance was the law of all the States at the time of the Revolution, and at the adoption of the Constitution ; and by that principle the citizens of the United States are, with the exceptions before mentioned," (namely, foreign-born children of citizens, under statutes to be presently referred to,) "such only as are either born or made so, born within the limits and under the jurisdiction of the United States, or naturalized by the authority of law, either in one of the States before the Constitution, or since that time, by virtue of an act of the Congress of the United States." p. 20. " The right of citizenship never *descends* in the legal sense, either by the common law, or under the common naturalization acts. It is incident to birth in the country, or it is given personally by statute. The child of an alien, if born in the country, is as much a citizen as the natural-born child of a citizen, and by operation of the same principle."

p. 22, note. This paper, without Mr. Binney's name, and with the note in a less complete form and not containing the passage last cited, was published (perhaps from the first edition) in the American Law Register for February, 1854. 2 Amer. Law Reg. 193, 203, 204.

IV. It was contended by one of the learned counsel for the United States that the rule of the Roman law, by which the citizenship of the child followed that of the parent, was the true rule of international law, as now recognized in most civilized countries, and had superseded the rule of the common law, depending on birth within the realm, originally founded on feudal considerations.

But at the time of the adoption of the Constitution of the United States in 1789, and long before, it would seem to have been the rule in Europe generally, as it certainly was in France, that, as said by Pothier, "citizens, true and native-born citizens, are those who are born within the extent of the dominion of France," and "mere birth within the realm gives the rights of a native-born citizen, independently of the origin of the father or mother, and of their domicil;" and children born in a foreign country, of a French father who had not established his domicil there nor given up the intention of returning, were also deemed Frenchmen, as Laurent says, by "a favor, a sort of fiction," and Calvo, "by a sort of fiction of exterritoriality, considered as born in France, and therefore invested with French nationality." Pothier Traité des Personnes, pt. 1, tit. 2, sect. 1, nos. 43, 45; *Walsh-Serrant* v. *Walsh-Serrant*, (1802) 3 Journal du Palais, 384; *S. C.*, 8 Merlin, Jurisprudence, (5th ed.) Domicile, § 13; *Préfet du Nord* v. *Lebeau*, (1862) Journal du Palais, 1863, 312 and note; 1 Laurent Droit Civil, no. 321; 2 Calvo Droit International, (5th ed.) § 542; Cockburn on Nationality, 13, 14 ; Hall's International Law, (4th ed.) § 68. The general principle of citizenship by birth within French territory prevailed until after the French Revolution, and was affirmed in successive constitutions, from the one adopted by the Constituent Assembly in 1791 to that of the French Republic in 1799. Constitutions et Chartes, (ed. 1830) pp. 100, 136, 148, 186.

The Code Napoleon of 1807 changed the law of France, and adopted, instead of the rule of country of birth, *jus soli*, the rule of descent or blood, *jus sanguinis*, as the leading principle; but an eminent commentator has observed that the framers of that code "appear not to have wholly freed themselves from the ancient rule of France, or rather, indeed, ancient rule of Europe— *de la vieille règle française, ou plutôt même de la vieille règle européenne* —according to which nationality had always been, in former times, determined by the place of birth." 1 Demolombe Cours de Code Napoleon, (4th ed.) no. 146.

The later modifications of the rule in Europe rest upon the constitutions, laws or ordinances of the various countries, and have no important bearing upon the interpretation and effect of the Constitution of the United States. The English Naturalization Act of 33 Vict. (1870) c. 14, and the Commissioners' Report of 1869 out of which it grew, both bear date since the adoption of the Fourteenth Amendment of the Constitution; and, as observed by Mr. Dicey, that act has not affected the principle by which any person who, whatever the nationality of his parents, is born within the British dominions, acquires British nationality at birth, and is a natural-born British subject. Dicey Conflict of Laws, 741. At the time of the passage of that act, although the tendency on the continent of Europe was to make parentage, rather than birthplace, the criterion of nationality, and citizenship was denied to the native-born children of foreign parents in Germany, Switzerland, Sweden and Norway, yet it appears still to have been conferred upon such children in Holland, Denmark and Portugal, and, when claimed under certain specified conditions, in France, Belgium, Spain, Italy, Greece and Russia. Cockburn on Nationality, 14–21.

There is, therefore, little ground for the theory that, at the time of the adoption of the Fourteenth Amendment of the Constitution of the United States, there was any settled and definite rule of international law, generally recognized by civilized nations, inconsistent with the ancient rule of citizenship by birth within the dominion.

Nor can it be doubted that it is the inherent right of every independent nation to determine for itself, and according to its own constitution and laws, what classes of persons shall be entitled to its citizenship.

Both in England and in the United States, indeed, statutes have been passed, at various times, enacting that certain issue born abroad of English subjects, or of American citizens, respectively, should inherit, to some extent at least, the rights of their parents. But those statutes applied only to cases coming within their purport; and they have never been considered, in either country, as affecting the citizenship of persons born within its dominion.

The earliest statute was passed in the reign of Edward III. In the Rolls of Parliament of 17 Edw. III, (1343) it is stated that "before these times there have been great doubt and difficulty among the Lords of this realm, and the Commons, as well men of the law as others, whether children who are born in parts beyond sea ought to bear inheritance after the death of their ancestors in England, because no certain law has been thereon ordained;" and by the King, Lords and Commons, it was unanimously agreed that "there was no manner of doubt that the children of our Lord the King, whether they were born on this side the sea or beyond the sea, should bear the inheritance of their ancestors;" "and in regard to other children, it was agreed in this Parliament, that they also should inherit wherever they might be born in the service of the King;" but, because the Parliament was about to depart, and the business demanded great advisement and good deliberation how it should be best and most surely done, the making of a statute was put off to the next Parliament. 2 Rot. Parl. 139. By reason, apparently, of the prevalence of the plague in England, no act upon the subject was passed until 25 Edw. III, (1350) when Parliament passed an act, entitled "A statute for those who are born in parts beyond sea," by which — after reciting that "some people be in doubt if the children born in the parts beyond the sea, out of the ligeance of England, should be able to demand any inheritance within the same ligeance, or not, whereof a petition was put

in the Parliament" of 17 Edw. III, " and was not at the same
time wholly assented" — it was (1) agreed and affirmed, "that
the law of the Crown of England is, and always hath been
such, that the children of the Kings of England, in whatso-
ever parts they be born, in England or elsewhere, be able and
ought to bear the inheritance after the death of their ances-
tors;" (2) also agreed that certain persons named, "which
were born beyond the sea, out of the ligeance of England,
shall be from henceforth able to have and enjoy their inheri-
tance after the death of their ancestors, in all parts within
the ligeance of England, as well as those that should be born
within the same ligeance:" (3) and further agreed "that all
children inheritors, which from henceforth shall be born with-
out the ligeance of the King, whose fathers and mothers at
the time of their birth be and shall be at the faith and ligeance
of the King of England, shall have and enjoy the same bene-
fits and advantages to have and bear the inheritance within
the same ligeance, as the other inheritors aforesaid, in time to
come; so always, that the mothers of such children do pass
the sea by the licence and wills of their husbands." 2 Rot.
Parl. 231; 1 Statutes of the Realm, 310.

It has sometimes been suggested that this general provision
of the statute of 25 Edw. III was declaratory of the common
law. See Bacon, *arguendo*, in *Calvin's Case*, 2 Howell's State
Trials, 585; Westlake and Pollock, *arguendo*, in *De Geer* v.
*Stone*, 22 Ch. D. 243, 247; 2 Kent Com. 50, 53; *Lynch* v.
*Clarke*, 1 Sandf. Ch. 583, 659, 660; *Ludlam* v. *Ludlam*, 26
N. Y. 356. But all suggestions to that effect seem to have
been derived, immediately or ultimately, from one or the other
of these two sources: The one, the Year Book of 1 Ric. III,
(1483) fol. 4, pl. 7, reporting a saying of Hussey, C. J., "that he
who is born beyond sea, and his father and mother are English,
their issue inherit by the common law, but the statute makes
clear, &c," — which, at best, was but *obiter dictum*, for the
Chief Justice appears to have finally rested his opinion on the
statute. The other, a note added to the edition of 1688 of
Dyer's Reports, 224*a*, stating that at Trinity Term 7 Edw. III,
Rot. 2 B. R., it was adjudged that children of subjects born

beyond the sea in the service of the King were inheritable — which has been shown, by a search of the roll in the King's Bench so referred to, to be a mistake, inasmuch as the child there in question did not appear to have been born beyond sea, but only to be living abroad. Westlake's Private International Law, (3d ed.) 324.

The statute of 25 Edw. III recites the existence of doubts as to the right of foreign-born children to inherit in England; and, while it is declaratory of the rights of children of the King, and is retrospective as to the persons specifically named, yet as to all others it is, in terms, merely prospective, applying to those only "who shall be born henceforth." Mr. Binney, in his paper above cited, after a critical examination of the statute, and of the early English cases, concluded: "There is nothing in the statute which would justify the conclusion that it is declaratory of the common law in any but a single particular, namely, in regard to the children of the King; nor has it at any time been judicially held to be so." "The notion that there is any common law principle to naturalize the children born in foreign countries, of native-born American father *and* mother, father *or* mother, must be discarded. There is not, and never was, any such common law principle." Binney on Alienigenæ, 14, 20; 2 Amer. Law. Reg. 199, 203. And the great weight of the English authorities, before and since he wrote, appears to support his conclusion. *Calvin's Case*, 7 Rep. 17*a*, 18*a*; Co. Lit. 8*a*, and Hargrave's note 36; 1 Bl. Com. 373; Barrington on Statutes, (5th ed.) 268; Lord Kenyon, in *Doe* v. *Jones*, 4 T. R. 300, 308; Lord Chancellor Cranworth, in *Shedden* v. *Patrick*, 1 Macq. 535, 611; Cockburn on Nationality, 7, 9; *De Geer* v. *Stone*, 22 Ch. D. 243, 252; Dicey Conflict of Laws, 178, 741. "The acquisition," says Mr. Dicey, (p. 741) "of nationality by descent, is foreign to the principles of the common law, and is based wholly upon statutory enactments."

It has been pertinently observed that if the statute of Edward III had only been declaratory of the common law, the subsequent legislation on the subject would have been wholly unnecessary. Cockburn on Nationality, 9. By the

statute of 29 Car. II, (1677) c. 6, § 1, entitled "An act for the naturalization of children of His Majesty's subjects born in foreign countries during the late troubles," all persons who, at any time between June 14, 1641, and March 24, 1660, "were born out of His Majesty's dominions, and whose fathers or mothers were natural-born subjects of this realm," were declared to be natural-born subjects. By the statute of 7 Anne, (1708) c. 5, § 3, "the children of all natural-born subjects, born out of the ligeance of Her Majesty, her heirs and successors" — explained by the statute of 4 Geo. II, (1731) c. 21, to mean all children born out of the ligeance of the Crown of England, "whose fathers were or shall be natural-born subjects of the Crown of England, or of Great Britain, at the time of the birth of such children respectively " — "shall be deemed, adjudged and taken to be natural-born subjects of this kingdom, to all intents, constructions and purposes whatsoever." That statute was limited to foreign-born children of natural-born subjects; and was extended by the statute of 13 Geo. III, (1773) c. 21, to foreign-born grandchildren of natural-born subjects, but not to the issue of such grandchildren; or, as put by Mr. Dicey, "British nationality does not pass by descent or inheritance beyond the second generation." See *De Geer* v. *Stone,* above cited; Dicey Conflict of Laws, 742.

Moreover, under those statutes, as is stated in the Report in 1869 of the Commissioners for inquiring into the Laws of Naturalization and Allegiance, "no attempt has ever been made on the part of the British Government, (unless in Eastern countries where special jurisdiction is conceded by treaty,) to enforce claims upon, or to assert rights in respect of, persons born abroad, as against the country of their birth whilst they were resident therein, and when by its law they were invested with its nationality." In the appendix to their report are collected many such cases in which the British Government declined to interpose, the reasons being most clearly brought out in a dispatch of March 13, 1858, from Lord Malmesbury, the Foreign Secretary, to the British Ambassador at Paris, saying: "It is competent to any country to confer by general or special legislation the privileges of nationality upon those

who are born out of its own territory; but it cannot confer
such privileges upon such persons as against the country of
their birth, when they voluntarily return to and reside therein.
Those born in the territory of a nation are (as a general princi-
ple) liable when actually therein to the obligations incident to
their status by birth.  Great Britain considers and treats such
persons as natural-born subjects, and cannot therefore deny
the right of other nations to do the same.  But Great Britain
cannot permit the nationality of the children of foreign parents
born within her territory to be questioned."  Naturalization
Commission Report, pp. viii, 67; U. S. Foreign Relations,
1873–1874, pp. 1237, 1337.  See also *Drummond's Case*, (1834)
2 Knapp, 295.

By the Constitution of the United States, Congress was em-
powered "to establish an uniform rule of naturalization."  In
the exercise of this power, Congress, by successive acts, begin-
ning with the act entitled "An act to establish an uniform
rule of naturalization," passed at the second session of the
First Congress under the Constitution, has made provision
for the admission to citizenship of three principal classes of
persons: First. Aliens, having resided for a certain time
" within the limits and under the jurisdiction of the United
States," and naturalized individually by proceedings in a
court of record.  Second. Children of persons so naturalized,
"dwelling within the United States, and being under the
age of twenty-one years at the time of such naturalization."
Third. Foreign-born children of American citizens, coming
within the definitions prescribed by Congress.  Acts of March
26, 1790, c. 3; January 29, 1795, c. 20; June 18, 1798, c. 54;
1 Stat. 103, 414, 566; April 14, 1802, c. 28; March 26, 1804,
c. 47; 2 Stat. 153, 292; February 10, 1855, c. 71; 10 Stat. 604;
Rev. Stat. §§ 2165, 2172, 1993.

In the act of 1790, the provision as to foreign-born children
of American citizens was as follows: "The children of citi-
zens of the United States, that may be born beyond sea, or
out of the limits of the United States, shall be considered as
natural-born citizens: Provided, that the right of citizenship
shall not descend to persons whose fathers have never been

resident in the United States." 1 Stat. 104. In 1795, this was reënacted, in the same words, except in substituting, for the words "beyond sea, or out of the limits of the United States," the words "out of the limits and jurisdiction of the United States." 1 Stat. 415.

In 1802, all former acts were repealed, and the provisions concerning children of citizens were reënacted in this form: " The children of persons duly naturalized under any of the laws of the United States, or who, previous to the passing of any law on that subject by the Government of the United States, may have become citizens of any one of the said States under the laws thereof, being under the age of twenty-one years at the time of their parents being so naturalized or admitted to the rights of citizenship, shall, if dwelling in the United States, be considered as citizens of the United States; and the children of persons who now are, or have been citizens of the United States shall, though born out of the limits and jurisdiction of the United States, be considered as citizens of the United States : Provided, that the right of citizenship shall not descend to persons whose fathers have never resided within the United States." Act of April 14, 1802, c. 28, § 4; 2 Stat. 155.

The provision of that act, concerning " the children of persons duly naturalized under any of the laws of the United States," not being restricted to the children of persons already naturalized, might well be held to include children of persons thereafter to be naturalized. 2 Kent Com. 51, 52; *West* v. *West*, 8 Paige, 433 ; *United States* v. *Kellar*, 11 Bissell, 314 ; *Boyd* v. *Thayer*, 143 U. S. 135, 177.

But the provision concerning foreign-born children, being expressly limited to the children of persons who then were or had been citizens, clearly did not include foreign-born children of any person who became a citizen since its enactment. 2 Kent Com. 52, 53; Binney on Alienigenæ, 20, 25 ; 2 Amer. Law Reg. 203, 205. Mr. Binney's paper, as he states in his preface, was printed by him in the hope that Congress might supply this defect in our law.

In accordance with his suggestions, it was enacted by the

statute of February 10, 1855, c. 71, that "persons heretofore born, or hereafter to be born, out of the limits and jurisdiction of the United States, whose fathers were or shall be at the time of their birth citizens of the United States, shall be deemed and considered and are hereby declared to be citizens of the United States: Provided, however, that the rights of citizenship shall not descend to persons whose fathers never resided in the United States." 10 Stat. 604; Rev. Stat. § 1993.

It thus clearly appears that, during the half century intervening between 1802 and 1855, there was no legislation whatever for the citizenship of children born abroad, during that period, of American parents who had not become citizens of the United States before the act of 1802; and that the act of 1855, like every other act of Congress upon the subject, has, by express proviso, restricted the right of citizenship, thereby conferred upon foreign-born children of American citizens, to those children themselves, unless they became residents of the United States. Here is nothing to countenance the theory that a general rule of citizenship by blood or descent has displaced in this country the fundamental rule of citizenship by birth within its sovereignty.

So far as we are informed, there is no authority, legislative, executive or judicial, in England or America, which maintains or intimates that the statutes (whether considered as declaratory, or as merely prospective,) conferring citizenship on foreign-born children of citizens, have superseded or restricted, in any respect, the established rule of citizenship by birth within the dominion. Even those authorities in this country, which have gone the farthest towards holding such statutes to be but declaratory of the common law, have distinctly recognized and emphatically asserted the citizenship of native-born children of foreign parents. 2 Kent Com. 39, 50, 53, 258 note; *Lynch* v. *Clarke*, 1 Sandf. Ch. 583, 659; *Ludlam* v. *Ludlam*, 26 N. Y. 356, 371.

Passing by questions once earnestly controverted, but finally put at rest by the Fourteenth Amendment of the Constitution, it is beyond doubt that, before the enactment of the Civil Rights Act of 1866 or the adoption of the Constitutional

Amendment, all white persons, at least, born within the sovereignty of the United States, whether children of citizens or of foreigners, excepting only children of ambassadors or public ministers of a foreign government, were native-born citizens of the United States.

V. In the fore front, both of the Fourteenth Amendment of the Constitution, and of the Civil Rights Act of 1866, the fundamental principle of citizenship by birth within the dominion was reaffirmed in the most explicit and comprehensive terms.

The Civil Rights Act, passed at the first session of the Thirty-ninth Congress, began by enacting that "all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties and give evidence, to inherit, purchase, lease, sell, hold and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains and penalties, and to none other, any law, statute, ordinance, regulation or custom, to the contrary notwithstanding." Act of April 9, 1866, c. 31, § 1; 14 Stat. 27.

The same Congress, shortly afterwards, evidently thinking it unwise, and perhaps unsafe, to leave so important a declaration of rights to depend upon an ordinary act of legislation, which might be repealed by any subsequent Congress, framed the Fourteenth Amendment of the Constitution, and on June 16, 1866; by joint resolution proposed it to the legislatures of the several States; and on July 28, 1868, the Secretary of State issued a proclamation showing it to have been ratified by the legislatures of the requisite number of States.   14 Stat. 358; 15 Stat. 708.

The first section of the Fourteenth Amendment of the Con-

stitution begins with the words, "All persons born or natural-
ized in the United States, and subject to the jurisdiction thereof,
are citizens of the United States and of the State wherein they
reside." As appears upon the face of the amendment, as well
as from the history of the times, this was not intended to im-
pose any new restrictions upon citizenship, or to prevent any
persons from becoming citizens by the fact of birth within the
United States, who would thereby have become citizens ac-
cording to the law existing before its adoption. It is declara-
tory in form, and enabling and extending in effect. Its main
purpose doubtless was; as has been often recognized by this
court, to establish the citizenship of free negroes, which had
been denied in the opinion delivered by Chief Justice Taney
in *Dred Scott* v. *Sandford*, (1857) 19 How. 393; and to put it
beyond doubt that all, blacks, as well as whites, born or natu-
ralized within the jurisdiction of the United States, are citizens
of the United States. *The Slaughterhouse Cases*, (1873) 16
Wall. 36, 73; *Strauder*.y. *West. Virginia*, (1879) 100 U. S. 303,
306; *Ex parte Virginia*, (1879) 100 U. S. 339, 345; *Neal* v.
*Delaware*, (1880) 103 U. S. 370, 386; *Elk* v. *Wilkins*, (1884)
112 U. S. 94, 101. But the opening words, "All persons born,"
are general, not to say universal, restricted only by place and
jurisdiction, and not by color or race — as was clearly recog-
nized in all the opinions delivered in *The Slaughterhouse Cases*,
above cited.

In those cases, the point adjudged was that a statute of
Louisiana, granting to a particular corporation the exclusive
right for twenty-five years to have and maintain slaughter-
houses within a certain district including the city of New
Orleans, requiring all cattle intended for sale or slaughter in
that district to be brought to the yards and slaughterhouses
of the grantee, authorizing all butchers to slaughter their
cattle there, and empowering the grantee to exact a reason-
able fee for each animal slaughtered, was within the police
powers of the State, and not in conflict with the Thirteenth
Amendment of the Constitution as creating an involuntary
servitude, nor with the Fourteenth Amendment as abridging
the privileges or immunities of citizens of the United States,

or as depriving persons of their liberty or property without due process of law, or as denying to them the equal protection of the laws.

Mr. Justice Miller, delivering the opinion of the majority of the court, after observing that the Thirteenth, Fourteenth and Fifteenth Articles of Amendment of the Constitution were all addressed to the grievances of the negro race, and were designed to remedy them, continued as follows: "We do not say that no one else but the negro can share in this protection. Both the language and spirit of these Articles are to have their fair and just weight in any question of construction. Undoubtedly, while negro slavery alone was in the mind of the Congress which proposed the Thirteenth Article, it forbids any other kind of slavery, now or hereafter. If Mexican peonage or the Chinese coolie labor system shall develop slavery of the Mexican or Chinese race within our territory, this Amendment may safely be trusted to make it void. And so if other rights are assailed by the States, which properly and necessarily fall within the protection of these Articles, that protection will apply, though the party interested may not be of African descent." 16 Wall. 72. And in treating of the first clause of the Fourteenth Amendment, he said: "The distinction between citizenship of the United States and citizenship of a State is clearly recognized and established. Not only may a man be a citizen of the United States without being a citizen of a State, but an important element is necessary to convert the former into the latter. He must reside within the State to make him a citizen of it, but it is only necessary that he should be born or naturalized in the United States to be a citizen of the Union." 16 Wall. 73, 74.

Mr. Justice Field, in a dissenting opinion, in which Chief Justice Chase and Justices Swayne and Bradley concurred, said of the same clause: "It recognizes in express terms, if it does not create, citizens of the United States, and it makes their citizenship dependent upon the place of their birth, or the fact of their adoption, and not upon the constitution or laws of any State or the condition of their ancestry." 16 Wall.

95, 111. Mr. Justice Bradley also said: "The question is
now settled by the Fourteenth Amendment itself, that citizen-
ship of the United States is the primary citizenship in this
country; and that state citizenship is secondary and deriva-
tive, depending upon citizenship of the United States and the
citizen's place of residence. The States have not now, if they
ever had, any power to restrict their citizenship to any classes
or persons." 16 Wall. 112. And Mr. Justice Swayne added:
"The language employed is unqualified in its scope. There
is no exception in its terms, and there can be properly none
in their application. By the language 'citizens of the United
States' was meant all such citizens; and by 'any person' was
meant all persons within the jurisdiction of the State. No
distinction is intimated on account of race or color. This
court has no authority to interpolate a limitation that is
neither expressed nor implied. Our duty is to execute the
law, not to make it. The protection provided was not in-
tended to be confined to those of any particular race or class,
but to embrace equally all races, classes and conditions of
men." 16 Wall. 128, 129.

Mr. Justice Miller, indeed, while discussing the causes
which led to the adoption of the Fourteenth Amendment,
made this remark: "The phrase, 'subject to its jurisdiction,'
was intended to exclude from its operation children of minis-
ters, consuls, and citizens or subjects of foreign States, born
within the United States." 16 Wall. 73. This was wholly
aside from the question in judgment, and from the course of
reasoning bearing upon that question. It was unsupported
by any argument, or by any reference to authorities; and
that it was not formulated with the same care and exactness,
as if the case before the court had called for an exact defini-
tion of the phrase, is apparent from its classing foreign minis-
ters and consuls together — whereas it was then well settled
law, as has since been recognized in a judgment of this court
in which Mr. Justice Miller concurred, that consuls, as such,
and unless expressly invested with a diplomatic character in
addition to their ordinary powers, are not considered as en-
trusted with authority to represent their sovereign in his in-

tercourse with foreign States or to vindicate his prerogatives, or entitled by the law of nations to the privileges and immunities of ambassadors or public ministers, but are subject to the jurisdiction, civil and criminal, of the courts of the country in which they reside. 1 Kent Com. 44 ; Story Conflict of Laws, § 48; Wheaton International Law, (8th ed.) § 249; *The Anne,* (1818) 3 Wheat. 435, 445, 446; *Gittings* v. *Crawford,* (1838) Taney, 1, 10; *In re Baiz,* (1890) 135 U. S. 403, 424.

In weighing a remark uttered under such circumstances, it is well to bear in mind the often quoted words of Chief Justice Marshall: "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated." *Cohens* v. *Virginia,* (1821) 6 Wheat. 264, 399.

That neither Mr. Justice Miller, nor any of the justices who took part in the decision of *The Slaughterhouse Cases,* understood the court to be committed to the view that all children born in the United States of citizens or subjects of foreign States were excluded from the operation of the first sentence of the Fourteenth Amendment, is manifest from a unanimous judgment of the court, delivered but two years later, while all those judges but Chief Justice Chase were still on the bench, in which Chief Justice Waite said: "Allegiance and protection are, in this connection" (that is, in relation to citizenship,) "reciprocal obligations. The one is a compensation for the other: allegiance for protection, and protection for allegiance." "At common law, with the nomenclature of which the framers of the Constitution were familiar, it was never doubted that all children, born in a country, of

parents who were its citizens, became themselves, upon their birth, citizens also. These were natives, or natural-born citizens, as distinguished from aliens or foreigners. Some authorities go further and include as citizens children born within the jurisdiction, without reference to the citizenship of their parents. As to this class there have been doubts, but never as to the first. For the purposes of this case it is not necessary to solve these doubts. It is sufficient, for everything we have now to consider, that all children, born of citizen parents within the jurisdiction, are themselves citizens." *Minor* v. *Happersett*, (1874) 21 Wall. 162, 166–168. The decision in that case was that a woman born of citizen parents within the United States was a citizen of the United States, although not entitled to vote, the right to the elective franchise not being essential to citizenship.

The only adjudication that has been made by this court upon the meaning of the clause, "and subject to the jurisdiction thereof," in the leading provision of the Fourteenth Amendment, is *Elk* v. *Wilkins*, 112 U. S. 94, in which it was decided that an Indian born a member of one of the Indian tribes within the United States, which still existed and was recognized as an Indian tribe by the United States, who had voluntarily separated himself from his tribe, and taken up his residence among the white citizens of a State, but who did not appear to have been naturalized, or taxed, or in any way recognized or treated as a citizen, either by the United States or by the State, was not a citizen of the United States, as a person born in the United States, "and subject to the jurisdiction thereof," within the meaning of the clause in question.

That decision was placed upon the grounds, that the meaning of those words was, "not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction, and owing them direct and immediate allegiance;" that by the Constitution, as originally established, "Indians not taxed" were excluded from the persons according to whose numbers representatives in Congress and direct taxes were apportioned among the

several States, and Congress was empowered to regulate commerce, not only " with foreign nations," and among the several States, but "with the Indian tribes;" that the Indian tribes, being within the territorial limits of the United States, were not, strictly speaking, foreign States, but were alien nations, distinct political communities, the members of which owed immediate allegiance to their several tribes, and were not part of the people of the United States; that the alien and dependent condition of the members of one of those tribes could not be put off at their own will, without the action or assent of the United States; and that they were never deemed citizens, except when naturalized, collectively or individually, under explicit provisions of a treaty, or of an act of Congress; and, therefore, that "Indians born within the territorial limits of the United States, members of, and owing immediate allegiance to, one of the Indian tribes (an alien, though dependent, power), although in a geographical sense born in the United States, are no more 'born in the United States, and subject to the jurisdiction thereof,' within the meaning of the first section of the Fourteenth Amendment, than the children of subjects of any foreign government born within the domain of that government, or the children born within the United States of ambassadors or other public ministers of foreign nations."   And it was observed that the language used, in defining citizenship, in the first section of the Civil Rights Act of 1866, by the very Congress which framed the Fourteenth Amendment, was " all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed."   112 U. S. 99–103.

Mr. Justice Harlan and Mr. Justice Woods, dissenting, were of opinion that the Indian in question, having severed himself from his tribe and become a *bona fide* resident of a State, had thereby become subject to the jurisdiction of the United States, within the meaning of the Fourteenth Amendment; and, in reference to the Civil Rights Act of 1866, said: "Beyond question, by that act, national citizenship was conferred directly upon all persons in this country, of whatever race (excluding only 'Indians not taxed'), who were born within

the territorial limits of the United States, and were not sub-
ject to any foreign power." And that view was supported
by reference to the debates in the Senate upon that act, and
to the ineffectual veto thereof by President Johnson, in which
he said : " By the first section of the bill, all persons born in
the United States, and not subject to any foreign power, ex-
cluding Indians not taxed, are declared to be citizens of the
United States. This provision comprehends the Chinese of the
Pacific States, Indians subject to taxation, the people called
Gypsies, as well as the entire race designated as blacks, per-
sons of color, negroes, mulattoes, and persons of African blood.
Every individual of those races, born in the United States, is,
by the bill, made a citizen of the United States." 112 U. S.
112–114.

The decision in *Elk* v. *Wilkins* concerned only members of
the Indian tribes within the United States, and had no ten-
dency to deny citizenship to children born in the United
States of foreign parents of Caucasian, African or Mongolian
descent, not in the diplomatic service of a foreign country.

The real object of the Fourteenth Amendment of the Con-
stitution, in qualifying the words, "All persons born in the
United States," by the addition, " and subject to the jurisdic-
tion thereof," would appear to have been to exclude, by the
fewest and fittest words, (besides children of members of the
Indian tribes, standing in a peculiar relation to the National
Government, unknown to the common law,) the two classes
of cases — children born of alien enemies in hostile occupa-
tion, and children of diplomatic representatives of a foreign
State — both of which, as has already been shown, by the law
of England, and by our own law, from the time of the first
settlement of the English colonies in America, had been recog-
nized exceptions to the fundamental rule of citizenship by
birth within the country. *Calvin's Case*, 7 Rep. 1, 18*b*;
Cockburn on Nationality, 7; Dicey Conflict of Laws, 177;
*Inglis* v. *Sailors' Snug Harbor*, 3 Pet. 99, 155 ; 2 Kent Com.
39, 42.

The principles upon which each of those exceptions rests
were long ago distinctly stated by this court.

In *United States* v. *Rice*, (1819) 4 Wheat. 246, goods imported into Castine, in the State of Maine while it was in the exclusive possession of the British authorities during the last war with England, were held not to be subject to duties under the revenue laws of the United States, because, as was said by Mr. Justice Story in delivering judgment: "By the conquest and military occupation of Castine, the enemy acquired that firm possession which enabled him to exercise the fullest rights of sovereignty over that place. The sovereignty of the United States over the territory was, of course, suspended, and the laws of the United States could no longer be rightfully enforced there, or be obligatory upon the inhabitants who remained and submitted to the conquerors. By the surrender the inhabitants passed under a temporary allegiance to the British Government, and were bound by such laws, and such only, as it chose to recognize and impose. From the nature of the case, no other laws could be obligatory upon them, for, where there is no protection or allegiance or sovereignty, there can be no claim to obedience." 4 Wheat. 254.

In the great case of *The Exchange*, (1812) 7 Cranch, 116, the grounds upon which foreign ministers are, and other aliens are not, exempt from the jurisdiction of this country, were set forth by Chief Justice Marshall in a clear and powerful train of reasoning, of which it will be sufficient, for our present purpose, to give little more than the outlines. The opinion did not touch upon the anomalous case of the Indian tribes, the true relation of which to the United States was not directly brought before this court until some years afterwards in *Cherokee Nation* v. *Georgia*, (1831) 5 Pet. 1; nor upon the case of a suspension of the sovereignty of the United States over part of their territory by reason of a hostile occupation, such as was also afterwards presented in *United States* v. *Rice*, above cited. But in all other respects it covered the whole question of what persons within the territory of the United States are subject to the jurisdiction thereof.

The Chief Justice first laid down the general principle: "The jurisdiction of the nation within its own territory is

necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction. All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source. This consent may be either express or implied. In the latter case, it is less determinate, exposed more to the uncertainties of construction; but, if understood, not less obligatory." 7 Cranch, 136.

He then stated, and supported by argument and illustration, the propositions, that "this full and absolute territorial jurisdiction, being alike the attribute of every sovereign, and being incapable of conferring extra-territorial power," has "given rise to a class of cases in which every sovereign is understood to waive the exercise of a part of that complete exclusive territorial jurisdiction, which has been stated to be the attribute of every nation" — the first of which is the exemption from arrest or detention of the person of a foreign sovereign entering its territory with its license, because "a foreign sovereign is not understood as intending to subject himself to a jurisdiction incompatible with his dignity and the dignity of his nation;" "a second case, standing on the same principles with the first, is the immunity which all civilized nations allow to foreign ministers;" "a third case, in which a sovereign is understood to cede a portion of his territorial jurisdiction, is where he allows the troops of a foreign prince to pass through his dominions;" and, in conclusion, that "a public armed ship, in the service of a foreign sovereign, with whom the Government of the United States is at peace, and having entered an American port open for her reception, on the terms on which ships of war are generally permitted to enter the ports of a friendly power, must be considered as having come into the American territory, under an implied promise, that while necessarily within it, and demeaning herself in a friendly

manner, she should be exempt from the jurisdiction of the country." 7 Cranch, 137–139, 147.

As to the immunity of a foreign minister, he said : " Whatever may be the principle on which this immunity is established, whether we consider him as in the place of the sovereign he represents ; or by a political fiction suppose him to be extra-territorial, and therefore, in point of law, not within the jurisdiction of the sovereign at whose court he resides; still the immunity itself is granted by the governing power of the nation to which the minister is deputed. This fiction of exterritoriality could not be erected and supported against the will of the sovereign of the territory.    He is supposed to assent to it."   " The assent of the sovereign to the very important and extensive exemptions from territorial jurisdiction, which are admitted to attach to foreign ministers, is implied from the considerations that, without such exemption, every sovereign would hazard his own dignity by employing a public minister abroad.    His minister would owe temporary and local allegiance to a foreign prince, and would be less competent to the objects of his mission.    A sovereign committing the interests of his nation with a foreign power, to the care of a person whom he has selected for that purpose, cannot intend to subject his minister in any degree to that power ; and, therefore, a consent to receive him, implies a consent that he shall possess those privileges which his principal intended he should retain — privileges which are essential to the dignity of his sovereign, and to the duties he is bound to perform." 7 Cranch, 138, 139.

The reasons for not allowing to other aliens exemption " from the jurisdiction of the country in which they are found " were stated as follows : " When private individuals of one nation spread themselves through another as business or caprice may direct, mingling indiscriminately with the inhabitants of that other, or when merchant vessels enter for the purposes of trade, it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction, and the government to degradation, if such individuals or merchants did not owe temporary and local allegiance, and were

not amenable to the jurisdiction of the country. Nor can the foreign sovereign have any motive for wishing such exemption. His subjects thus passing into foreign countries are not employed by him, nor are they engaged in national pursuits. Consequently there are powerful motives for not exempting persons of this description from the jurisdiction of the country in which they are found, and no one motive for requiring it. The implied license, therefore, under which they enter, can never be construed to grant such exemption." 7 Cranch, 144.

In short, the judgment in the case of *The Exchange* declared, as incontrovertible principles, that the jurisdiction of every nation within its own territory is exclusive and absolute, and is susceptible of no limitation not imposed by the nation itself; that all exceptions to its full and absolute territorial jurisdiction must be traced up to its own consent, express or implied; that upon its consent to cede, or to waive the exercise of, a part of its territorial jurisdiction, rest the exemptions from that jurisdiction of foreign sovereigns or their armies entering its territory with its permission, and of their foreign ministers and public ships of war; and that the implied license, under which private individuals of another nation enter the territory and mingle indiscriminately with its inhabitants, for purposes of business or pleasure, can never be construed to grant to them an exemption from the jurisdiction of the country in which they are found. See also *Carlisle* v. *United States*, (1872) 16 Wall. 147, 155; *Radich* v. *Hutchins*, (1877) 95 U. S. 210; *Wildenhus's Case*, (1887) 120 U. S. 1; *Chae Chan Ping* v. *United States*, (1889) 130 U. S. 581, 603, 604.

From the first organization of the National Government under the Constitution, the naturalization acts of the United States, in providing for the admission of aliens to citizenship by judicial proceedings, uniformly required every applicant to have resided for a certain time "within the limits and under the jurisdiction of the United States;" and thus applied the words "under the jurisdiction of the United States" to aliens residing here before they had taken an oath to support the Constitution of the United States, or had renounced allegiance

to a foreign government.   Acts of March 26, 1790, c. 3; January 29, 1795, c. 20, § 1;  June 18, 1798, c. 54, §§ 1, 6; 1 Stat. 103, 414, 566, 568; April 14, 1802, c. 28, § 1; 2 Stat. 153; March 22, 1816, c. 32, § 1; 3 Stat. 258; May 24, 1828, c. 116, § 2; 4 Stat. 310; Rev. Stat. § 2165.   And, from 1795, the provisions of those acts, which granted citizenship to foreign-born children of American parents, described such children as "born out of the limits and jurisdiction of the United States."   Acts of January 29, 1795, c. 20, § 3; 1 Stat. 415; April 14, 1802, c. 28, § 4; 2 Stat. 155; February 10, 1855, c. 71; 10 Stat. 604; Rev. Stat. §§ 1993, 2172.   Thus Congress, when dealing with the question of citizenship in that aspect, treated aliens residing in this country as "under the jurisdiction of the United States," and American parents residing abroad as "out of the jurisdiction of the United States."

The words "in the United States, and subject to the jurisdiction thereof," in the first sentence of the Fourteenth Amendment of the Constitution, must be presumed to have been understood and intended by the Congress which proposed the Amendment, and by the legislatures which adopted it, in the same sense in which the like words had been used by Chief Justice Marshall in the well known case of *The Exchange;* and as the equivalent of the words "within the limits and under the jurisdiction of the United States," and the converse of the words, "out of the limits and jurisdiction of the United States," as habitually used in the naturalization acts.   This presumption is confirmed by the use of the word "jurisdiction" in the last clause of the same section of the Fourteenth Amendment, which forbids any State to "deny to any person within its jurisdiction the equal protection of the laws."   It is impossible to construe the words "subject to the jurisdiction thereof," in the opening sentence, as less comprehensive than the words "within its jurisdiction," in the concluding sentence of the same section; or to hold that persons "within the jurisdiction" of one of the States of the Union are not "subject to the jurisdiction of the United States."

These considerations confirm the view, already expressed in this opinion, that the opening sentence of the Fourteenth

Amendment is throughout affirmative and declaratory, intended to allay doubts and to settle controversies which had arisen, and not to impose any new restrictions upon citizenship.

By the Civil Rights Act of 1866, "all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed," were declared to be citizens of the United States. In the light of the law as previously established, and of the history of the times, it can hardly be doubted that the words of that act, "not subject to any foreign power," were not intended to exclude any children born in this country from the citizenship which would theretofore have been their birthright; or, for instance, for the first time in our history, to deny the right of citizenship to native-born children of foreign white parents not in the diplomatic service of their own country, nor in hostile occupation of part of our territory. But any possible doubt in this regard was removed when the negative words of the Civil Rights Act, "not subject to any foreign power," gave way, in the Fourteenth Amendment of the Constitution, to the affirmative words, "subject to the jurisdiction of the United States."

This sentence of the Fourteenth Amendment is declaratory of existing rights, and affirmative of existing law, as to each of the qualifications therein expressed — "born in the United States," "naturalized in the United States," and "subject to the jurisdiction thereof" — in short, as to everything relating to the acquisition of citizenship by facts occurring within the limits of the United States. But it has not touched the acquisition of citizenship by being born abroad of American parents; and has left that subject to be regulated, as it had always been, by Congress, in the exercise of the power conferred by the Constitution to establish an uniform rule of naturalization.

The effect of the enactments conferring citizenship on foreign-born children of American parents has been defined, and the fundamental rule of citizenship by birth within the dominion of the United States, notwithstanding alienage of parents, has been affirmed, in well considered opinions of the executive departments of the Government, since the adoption of the Fourteenth Amendment of the Constitution.

In 1869, Attorney General Hoar gave to Mr. Fish, the Secretary of State, an opinion that children born and domiciled abroad, whose fathers were native-born citizens of the United States and had at some time resided therein, were, under the statute of February 10, 1855, c. 71, citizens of the United States, and " entitled to all the privileges of citizenship which it is in the power of the United States Government to confer. Within the sovereignty and jurisdiction of this nation, they are undoubtedly entitled to all the privileges of citizens." " But," the Attorney General added, " while the United States may, by law, fix or declare the conditions constituting citizens of the country within its own territorial jurisdiction, and may confer the rights of American citizens everywhere upon persons who are not rightfully subject to the authority of any foreign country or government, it is clear that the United States cannot, by undertaking to confer the rights of citizenship upon the subjects of a foreign nation, who have not come within our territory, interfere with the just rights of such nation to the government and control of its own subjects. If, therefore, by the laws of the country of their birth, children of American citizens, born in that country, are subjects of its government, I do not think that it is competent to the United States, by any legislation, to interfere with that relation, or, by undertaking to extend to them the rights of citizens of this country, to interfere with the allegiance which they may owe to the country of their birth while they continue within its territory, or to change the relation to other foreign nations which, by reason of their place of birth, may at any time exist. The rule of the common law I understand to be, that a person 'born in a strange country, under the obedience of a strange prince or country, is an alien' (Co. Lit. 128*b*,) and that every person owes allegiance to the country of his birth." 13 Opinions of Attorneys General, 89–91.

In 1871, Mr. Fish, writing to Mr. Marsh, the American Minister to Italy, said : " The Fourteenth Amendment to the Constitution declares that 'all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States.' This is simply an affirm-

ance of the common law of England and of this country, so far as it asserts the status of citizenship to be fixed by the place of nativity, irrespective of parentage. The qualification, 'and subject to the jurisdiction thereof,' was probably intended to exclude the children of foreign ministers, and of other persons who may be within our territory with rights of extraterritoriality." 2 Whart. Int. Dig. p. 394.

In August, 1873, President Grant, in the exercise of the authority expressly conferred upon the President by art. 2, sect. 2, of the Constitution, to "require the opinion, in writing, of the principal officer in each of the executive departments, upon any subject relating to the duties of their respective offices," required the opinions of the members of his cabinet upon several questions of allegiance, naturalization and expatriation. Mr. Fish, in his opinion, which is entitled to much weight, as well from the circumstances under which it was rendered, as from its masterly treatment of the subject, said:

"Every independent State has as one of the incidents of its sovereignty the right of municipal legislation and jurisdiction over all persons within its territory, and may therefore change their nationality by naturalization, and this, without regard to the municipal laws of the country whose subjects are so naturalized, as long as they remain, or exercise the rights conferred by naturalization, within the territory and jurisdiction of the State which grants it.

"It may also endow with the rights and privileges of its citizenship persons residing in other countries, so as to entitle them to all rights of property and of succession within its limits, and also with political privileges and civil rights to be enjoyed or exercised within the territory and jurisdiction of the State thus conferring its citizenship.

"But no sovereignty can extend its jurisdiction beyond its own territorial limits so as to relieve those born under and subject to another jurisdiction, from their obligations or duties thereto; nor can the municipal law of one State interfere with the duties or obligations which its citizens incur, while voluntarily resident in such foreign State and without the jurisdiction of their own country.

"It is evident from the proviso in the act of 10th February, 1855, viz., 'that the rights of citizenship shall not descend to persons whose fathers never resided in the United States,' that the law-making power not only had in view this limit to the efficiency of its own municipal enactments in foreign jurisdiction; but that it has conferred only a qualified citizenship upon the children of American fathers born without the jurisdiction of the United States, and has denied to them, what pertains to other American citizens, the right of transmitting citizenship to their children, unless they shall have made themselves residents of the United States, or, in the language of the Fourteenth Amendment of the Constitution, have made themselves 'subject to the jurisdiction thereof.'

"The child born of alien parents in the United States is held to be a citizen thereof, and to be subject to duties with regard to this country which do not attach to the father.

"The same principle on which such children are held by us to be citizens of the United States, and to be subject to duties to this country, applies to the children of American fathers born without the jurisdiction of the United States, and entitles the country within whose jurisdiction they are born to claim them as citizens and to subject them to duties to it.

"Such children are born to a double character: the citizenship of the father is that of the child, so far as the laws of the country of which the father is a citizen are concerned, and within the jurisdiction of that country; but the child. from the circumstances of his birth, may acquire rights and owes another fealty besides that which attaches to the father." Opinions of the Executive Departments on Expatriation, Naturalization and Allegiance, (1873) 17, 18; U. S. Foreign Relations, 1873–74, pp. 1191, 1192.

In 1886, upon the application of a son born in France of an American citizen, and residing in France, for a passport, Mr. Bayard, the Secretary of State, as appears by letters from him to the Secretary of Legation in Paris, and from the latter to the applicant, quoted and adopted the conclusions of Attorney General Hoar in his opinion above cited.   U. S. Foreign Relations, 1886, p. 303; 2 Calvo Droit International, § 546.

These opinions go to show that, since the adoption of the Fourteenth Amendment, the executive branch of the Government, the one charged with the duty of protecting American citizens abroad against unjust treatment by other nations, has taken the same view of the act of Congress of 1855, declaring children born abroad of American citizens to be themselves citizens, which, as mentioned in a former part of this opinion, the British Foreign Office has taken of similar acts of Parliament — holding that such statutes cannot, consistently with our own established rule of citizenship by birth in this country, operate extra-territorially so far as to relieve any person born and residing in a foreign country, and subject to its government, from his allegiance to that country.

In a very recent case, the Supreme Court of New Jersey held that a person, born in this country of Scotch parents who were domiciled but had not been naturalized here, was "subject to the jurisdiction of the United States," within the meaning of the Fourteenth Amendment, and was "not subject to any foreign power," within the meaning of the Civil Rights Act of 1866 ; and, in an opinion delivered by Justice Van Syckel, with the concurrence of Chief Justice Beasley, said : "The object of the Fourteenth Amendment, as is well known, was to confer upon the colored race the right of citizenship. It, however, gave to the colored people no right superior to that granted to the white race. The ancestors of all the colored people then in the United States were of foreign birth, and could not have been naturalized, or in any way have become entitled to the right of citizenship. The colored people were no more subject to the jurisdiction of the United States, by reason of their birth here, than were the white children born in this country of parents who were not citizens. The same rule must be applied to both races; and unless the general rule, that when the parents are domiciled here birth establishes the right to citizenship, is accepted, the Fourteenth Amendment has failed to accomplish its purpose, and the colored people are not citizens. The Fourteenth Amendment, by the language, 'all persons born in the United States, and subject to the jurisdiction thereof,' was intended

to bring all races, without distinction of color, within the rule which prior to that time pertained to the white race." *Benny* v. *O'Brien,* (1895) 29 Vroom (58 N. J. Law), 36, 39, 40.

The foregoing considerations and authorities irresistibly lead us to these conclusions: The Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children here born of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes. The Amendment, in clear words and in manifest intent, includes the children born, within the territory of the United States, of all other persons, of whatever race or color, domiciled within the United States. Every citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States. His allegiance to the United States is direct and immediate, and, although but local and temporary, continuing only so long as he remains within our territory, is yet, in the words of Lord Coke, in *Calvin's Case,* 7 Rep. 6*a*, "strong enough to make a natural subject, for if he hath issue here, that issue is a natural-born subject;" and his child, as said by Mr. Binney in his essay before quoted, "if born in the country, is as much a citizen as the natural-born child of a citizen, and by operation of the same principle." It can hardly be denied that an alien is completely subject to the political jurisdiction of the country in which he resides — seeing that, as said by Mr. Webster, when Secretary of State, in his Report to the President on *Thrasher's Case* in 1851, and since repeated by this court, "independently of a residence with intention to continue such residence; independently of any domiciliation; independently of the taking of any oath of allegiance or of renouncing any former allegiance, it is well known that, by the public law, an alien, or a stranger

born, for so long a time as he continues within the dominions of a foreign government, owes obedience to the laws of that government, and may be punished for treason, or other crimes, as a native-born subject might be, unless his case is varied by some treaty stipulations." Ex. Doc. H. R. No. 10, 1st sess. 32d Congress, p. 4; 6 Webster's Works, 526; *United States* v. *Carlisle*, 16 Wall. 147, 155; *Calvin's Case*, 7 Rep. 6a; Ellesmere on Postnati, 63; 1 Hale P. C. 62; 4 Bl. Com. 74, 92.

To hold that the Fourteenth Amendment of the Constitution excludes from citizenship the children, born in the United States, of citizens or subjects of other countries, would be to deny citizenship to thousands of persons of English, Scotch, Irish, German or other European parentage, who have always been considered and treated as citizens of the United States.

VI. Whatever considerations, in the absence of a controlling provision of the Constitution, might influence the legislative or the executive branch of the Government to decline to admit persons of the Chinese race to the status of citizens of the United States, there are none that can constrain or permit the judiciary to refuse to give full effect to the peremptory and explicit language of the Fourteenth Amendment, which declares and ordains that "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States."

Chinese persons, born out of the United States, remaining subjects of the Emperor of China, and not having become citizens of the United States, are entitled to the protection of and owe allegiance to the United States, so long as they are permitted by the United States to reside here; and are "subject to the jurisdiction thereof," in the same sense as all other aliens residing in the United States. *Yick Wo* v. *Hopkins*, (1886) 118 U. S. 356; *Law Ow Bew* v. *United States*, (1892) 144 U. S. 47, 61, 62; *Fong Yue Ting* v. *United States*, (1893) 149 U. S. 698, 724; *Lem Moon Sing* v. *United States*, (1895) 158 U. S. 538, 547; *Wong Wing* v. *United States*, (1896) 163 U. S. 228, 238.

In *Yick Wo* v. *Hopkins* the decision was that an ordinance

of the city of San Francisco, regulating a certain business, and which, as executed by the board of supervisors, made an arbitrary discrimination between natives of China, still subjects of the Emperor of China, but domiciled in the United States, and all other persons, was contrary to the Fourteenth Amendment of the Constitution. Mr. Justice Matthews, in delivering the opinion of the court, said: "The rights of the petitioners, as affected by the proceedings of which they complain, are not less, because they are aliens and subjects of the Emperor of China." "The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says, 'Nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws. It is accordingly enacted, by § 1977 of the Revised Statutes, that 'all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.' The questions we have to consider and decide in these cases, therefore, are to be treated as involving the rights of every citizen of the United States, equally with those of the strangers and aliens who now invoke the jurisdiction of this court." 118 U. S. 368, 369.

The manner in which reference was made, in the passage above quoted, to § 1977 of the Revised Statutes, shows that the change of phrase in that section, reënacting § 16 of the statute of May 31, 1870, c. 114, 16 Stat. 144, as compared with § 1 of the Civil Rights Act of 1866 — by substituting, for the words in that act, "of every race and color," the words, "within the jurisdiction of the United States" — was not

considered as making the section, as it now stands, less appli-
cable to persons of every race and color and nationality, than
it was in its original form; and is hardly consistent with
attributing any narrower meaning to the words "subject to
the jurisdiction thereof" in the first sentence of the Four-
teenth Amendment of the Constitution, which may itself have
been the cause of the change in the phraseology of that pro-
vision of the Civil Rights Act.

The decision in *Yick Wo* v. *Hopkins*, indeed, did not directly
pass upon the effect of these words in the Fourteenth Amend-
ment, but turned upon subsequent provisions of the same section.
But, as already observed, it is impossible to attribute to the
words, "subject to the jurisdiction thereof," that is to say, of the
United States, at the beginning, a less comprehensive meaning
than to the words "within its jurisdiction," that is, of the State,
at the end of the same section; or to hold that persons, who
are indisputably "within the jurisdiction" of the State, are
not "subject to the jurisdiction" of the Nation.

It necessarily follows that persons born in China, subjects of
the Emperor of China, but domiciled in the United States, hav-
ing been adjudged, in *Yick Wo* v. *Hopkins*, to be within the
jurisdiction of the State, within the meaning of the concluding
sentence, must be held to be subject to the jurisdiction of the
United States, within the meaning of the first sentence of this
section of the Constitution; and their children, "born in the
United States," cannot be less "subject to the jurisdiction
thereof."

Accordingly, in *Quock Ting* v. *United States*, (1891) 140
U. S. 417, which, like the case at bar, was a writ of *habeas cor-
pus* to test the lawfulness of the exclusion of a Chinese person
who alleged that he was a citizen of the United States by
birth, it was assumed on all hands that a person of the Chinese
race, born in the United States, was a citizen of the United
States. The decision turned upon the failure of the petitioner
to prove that he was born in this country; and the question
at issue was, as stated in the opinion of the majority of the
court, delivered by Mr. Justice Field, "whether the evidence
was sufficient to show that the petitioner was a citizen of the

United States," or, as stated by Mr. Justice Brewer in his dissenting opinion, " whether the petitioner was born in this country or not."   140 U. S. 419, 423.

In *State* v. *Ah Chew*, (1881) 16 Nevada, 50, 58, the Supreme Court of Nevada said : " The Amendments did not confer the right of citizenship upon the Mongolian race, except such as are born within the United States."   In the courts of the United States in the Ninth Circuit, it has been uniformly held, in a series of opinions delivered by Mr. Justice Field, . Judge Sawyer, Judge Deady, Judge Hanford and Judge Morrow, that a child born in the United States of Chinese parents, subjects of the Emperor of China, is a native-born citizen of the United States.   *In re Look Tin Sing*, (1884) 10 Sawyer, 353 ; *Ex parte Chin King*, (1888) 13 Sawyer, 333 ; *In re Yung Sing Hee*, (1888) 13 Sawyer, 482 ; *In re Wy Shing*, (1888) 13 Sawyer, 530 ; *Gee Fook Sing* v. *United States*, (1892) 7 U. S. App. 27 ; *In re Wong Kim Ark*, (1896) 71 Fed. Rep. 382.   And we are not aware of any judicial decision to the contrary.

During the debates in the Senate in January and February, 1866, upon the Civil Rights Bill, Mr. Trumbull, the chairman of the committee which reported the bill, moved to amend the first sentence thereof so as to read, "All persons born in the United States, and not subject to any foreign power, are hereby declared to be· citizens of the United States, without distinction of color."   Mr. Cowan, of Pennsylvania, asked, " Whether it will not have the effect of naturalizing the children of Chinese and Gypsies, born in this country ? "   Mr. Trumbull answered, " Undoubtedly ; " and asked, " Is not the child born in this country of German parents a citizen ? "   Mr. Cowan replied, ' " The children of ·German parents are citizens ; but Germans are not Chinese."   Mr. Trumbull rejoined : " The law makes no such distinction ; and the child of an Asiatic is just as much a citizen as the child of a European."   Mr. Reverdy Johnson suggested that the words, " without distinction of color," should be omitted as unnecessary ; and said : " The amendment, as it stands, is that all persons born in the United States, and not subject to a foreign power, shall, by virtue of birth, be citizens.   To that I am willing to ·con-

sent; and that comprehends all persons, without any reference to race or color, who may be so born." And Mr. Trumbull agreed that striking out those words would make no difference in the meaning, but thought it better that they should be retained, to remove all possible doubt. Congressional Globe, 39th Congress, 1st sess. pt. 1, pp. 498, 573, 574.

The Fourteenth Amendment of the Constitution, as originally framed by the House of Representatives, lacked the opening sentence. When it came before the Senate in May, 1866, Mr. Howard, of Michigan, moved to amend by prefixing the sentence in its present form, (less the words " or naturalized,") and reading, "All persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." Mr. Cowan objected, upon the ground that the Mongolian race ought to be excluded; and said: " Is the child of the Chinese immigrant in California a citizen?" "I do not know how my honorable friend from California looks upon Chinese, but I do know how some of his fellow-citizens regard them. I have no doubt that now they are useful, and I have no doubt that within proper restraints, allowing that State and the other Pacific States to manage them as they may see fit, they may be useful; but I would not tie their hands by the Constitution of the United States so as to prevent them hereafter from dealing with them as in their wisdom they see fit." Mr. Conness, of California, replied : " The proposition before us relates simply, in that respect, to the children begotten of Chinese parents in California, and it is proposed to declare that they shall be citizens. We have declared that by law ; now it is proposed to incorporate the same provision in the fundamental instrument of the Nation. I am in favor of doing so. I voted for the proposition to declare that the children of all parentage whatever, born in California, should be regarded and treated as citizens of the United States, entitled to equal civil rights with other citizens of the United States." " We are entirely ready to accept the provision proposed in this Constitutional Amendment, that the children born here of Mongolian parents shall be declared by the Constitution of

the United States to be entitled to civil rights and to equal protection before the law with others." Congressional Globe, 39th Congress, 1st sess. pt. 4, pp. 2890–2892. It does not appear to have been suggested, in either House of Congress, that children born in the United States of Chinese parents would not come within the terms and effect of the leading sentence of the Fourteenth Amendment.

Doubtless, the intention of the Congress which framed and of the States which adopted this Amendment of the Constitution must be sought in the words of the Amendment; and the debates in Congress are not admissible as evidence to control the meaning of those words. But the statements above quoted are valuable as contemporaneous opinions of jurists and statesmen upon the legal meaning of the words themselves; and are, at the least, interesting as showing that the application of the Amendment to the Chinese race was considered and not overlooked.

The acts of Congress, known as the Chinese Exclusion Acts, the earliest of which was passed some fourteen years after the adoption of the Constitutional Amendment, cannot control its meaning, or impair its effect, but must be construed and executed in subordination to its provisions. And the right of the United States, as exercised by and under those acts, to exclude or to expel from the country persons of the Chinese race, born in China, and continuing to be subjects of the Emperor of China, though having acquired a commercial domicil in the United States, has been upheld by this court, for reasons applicable to all aliens alike, and inapplicable to citizens, of whatever race or color. *Chae Chan Ping* v. *United States,* 130 U. S. 581; *Nishimura Ekiu* v. *United States,* 142 U. S. 651; *Fong Yue Ting* v. *United States,* 149 U. S. 698; *Lem Moon Sing* v. *United States,* 158 U. S. 538; *Wong Wing* v. *United States,* 163 U. S. 228.

In *Fong Yue Ting* v. *United States,* the right of the United States to expel such Chinese persons was placed upon the grounds, that the right to exclude or to expel all aliens, or any class of aliens, absolutely or upon certain conditions, is an inherent and inalienable right of every sovereign and indepen-

dent nation, essential to its safety, its independence and its welfare; that the power to exclude or to expel aliens, being a power affecting international relations, is vested in the political departments of the Government, and is to be regulated by treaty or by act of Congress, and to be executed by the executive authority according to the regulations so established, except so far as the judicial department has been authorized by treaty or by statute, or is required by the paramount law of the Constitution, to intervene; that the power to exclude and the power to expel aliens rest upon one foundation, are derived from one source, are supported by the same reasons, and are in truth but parts of one and the same power; and, therefore, that the power of Congress to expel, like the power to exclude aliens, or any specified class of aliens, from the country, may be exercised entirely through executive officers; or Congress may call in the aid of the judiciary to ascertain any contested facts on which an alien's right to be in the country has been made by Congress to depend.   149 U. S. 711, 713, 714.

In *Lem Moon Sing* v. *United States*, the same principles were reaffirmed, and were applied to a Chinese person, born in China, who had acquired a commercial domicil in the United States, and who, having voluntarily left the country on a temporary visit to China, and with the intention of returning to and continuing his residence in this country, claimed the right under a statute or treaty to reënter it; and the distinction between the right of an alien to the protection of the Constitution and laws of the United States for his person and property while within the jurisdiction thereof, and his claim of a right to reënter the United States after a visit to his native land, was expressed by the court as follows: " He is none the less an alien, because of his having a commercial domicil in this country.  While he lawfully remains here, he is entitled to the benefit of the guaranties of life, liberty and property, secured by the Constitution to all persons, of whatever race, within the jurisdiction of the United States.  His personal rights when he is in this country, and such of his property as is here during his absence, are as fully protected by the supreme law of the land, as if he were a native or

naturalized citizen of the United States. But when he has voluntarily gone from the country, and is beyond its jurisdiction, being an alien, he cannot reënter the United States in violation of the will of the Government as expressed in enactments of the law-making power." 158 U. S. 547, 548.

It is true that Chinese persons born in China cannot be naturalized, like other aliens, by proceedings under the naturalization laws. But this is for want of any statute or treaty authorizing or permitting such naturalization, as will appear by tracing the history of the statutes, treaties and decisions upon that subject — always bearing in mind that statutes enacted by Congress, as well as treaties made by the President and Senate, must yield to the paramount and supreme law of the Constitution.

The power, granted to Congress by the Constitution, "to establish an uniform rule of naturalization," was long ago adjudged by this court to be vested exclusively in Congress. *Chirac* v. *Chirac*, (1817) 2 Wheat. 259. For many years after the establishment of the original Constitution, and until two years after the adoption of the Fourteenth Amendment, Congress never authorized the naturalization of any but "free white persons." Acts of March 26, 1790, c. 3, and January 29, 1795, c. 20; 1 Stat. 103, 414; April 14, 1802, c. 28, and March 26, 1804, c. 47; 2 Stat. 153, 292; March 22, 1816, c. 32; 3 Stat. 258; May 26, 1824, c. 186, and May 24, 1828, c. 116; 4 Stat. 69, 310. By the treaty between the United States and China, made July 28, 1868, and promulgated February 5, 1870, it was provided that "nothing herein contained shall be held to confer naturalization upon citizens of the United States in China, nor upon the subjects of China in the United States." 16 Stat. 740. By the act of July 14, 1870, c. 254, § 7, for the first time, the naturalization laws were "extended to aliens of African nativity and to persons of African descent." 16 Stat. 256. This extension, as embodied in the Revised Statutes, took the form of providing that those laws should "apply to aliens [being free white persons, and to aliens] of African nativity and to persons of African descent;" and it was amended by the act of February

18, 1875, c. 80, by inserting the words above printed in brackets. Rev. Stat. (2d ed.) § 2169; 18 Stat. 318. Those statutes were held, by the Circuit Court of the United States in California, not to embrace Chinese aliens. *In re Ah Yup*, (1878) 5 Sawyer, 155. And by the act of May 6, 1882, c. 126, § 14, it was expressly enacted that " hereafter no state court or court of the United States shall admit Chinese to citizenship." 22 Stat. 61.

In *Fong Yue Ting* v. *United States*, (1893) above cited, this court said: " Chinese persons not born in this country have never been recognized as citizens of the United States, nor authorized to become such under the naturalization laws." 149 U. S. 716.

The Convention between the United States and China of 1894 provided that " Chinese laborers or Chinese of any other class, either permanently or temporarily residing in the United States, shall have for the protection of their persons and property all rights that are given by the laws of the United States to citizens of the most favored nation, excepting the right to become naturalized citizens." 28 Stat. 1211. And it has since been decided, by the same judge who held this appellee to be a citizen of the United States by virtue of his birth therein, that a native of China of the Mongolian race could not be admitted to citizenship under the naturalization laws. *In re Gee Hop*, (1895) 71 Fed. Rep. 274.

The Fourteenth Amendment of the Constitution, in the declaration that " all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside," contemplates two sources of citizenship, and two only : birth and naturalization. Citizenship by naturalization can only be acquired by naturalization under the authority and in the forms of law. But citizenship by birth is established by the mere fact of birth under the circumstances defined in the Constitution. Every person born in the United States, and subject to the jurisdiction thereof, becomes at once a citizen of the United States, and needs no naturalization. A person born out of the jurisdiction of the United States can only become a citizen by being naturalized, either by treaty, as in the case

of the annexation of foreign territory ; or by authority of Congress, exercised either by declaring certain classes of persons to be citizens, as in the enactments conferring citizenship upon foreign-born children of citizens, or by enabling foreigners individually to become citizens by proceedings in the judicial tribunals, as in the ordinary provisions of the naturalization acts.

The power of naturalization, vested in Congress by the Constitution, is a power to confer citizenship, not a power to take it away. " A naturalized citizen," said Chief Justice Marshall, " becomes a member of the society, possessing all the rights of a native citizen, and standing, in the view of the Constitution, on the footing of a native. The Constitution does not authorize Congress to enlarge or abridge those rights. The simple power of the National Legislature is to prescribe a uniform rule of naturalization, and the exercise of this power exhausts it, so far as respects the individual. The Constitution then takes him up, and, among other rights, extends to him the capacity of suing in the courts of the United States, precisely under the same circumstances under which a native might sue." *Osborn* v. *United States Bank*, 9 Wheat. 738, 827. Congress having no power to abridge the rights conferred by the Constitution upon those who have become naturalized citizens by virtue of acts of Congress, *a fortiori* no act or omission of Congress, as to providing for the naturalization of parents or children of a particular race, can affect citizenship acquired as a birthright, by virtue of the Constitution itself, without any aid of legislation. The Fourteenth Amendment, while it leaves the power, where it was before, in Congress, to regulate naturalization, has conferred no authority upon Congress to restrict the effect of birth, declared by the Constitution to constitute a sufficient and complete right to citizenship.

No one doubts that the Amendment, as soon as it was promulgated, applied to persons of African descent born in the United States, wherever the birthplace of their parents might have been; and yet, for two years afterwards, there was no statute authorizing persons of that race to be naturalized. If the omission or the refusal of Congress to permit certain

classes of persons to be made citizens by naturalization could be allowed the effect of correspondingly restricting the classes of persons who should become citizens by birth, it would be in the power of Congress, at any time, by striking negroes out of the naturalization laws, and limiting those laws, as they were formerly limited, to white persons only, to defeat the main purpose of the Constitutional Amendment.

The fact, therefore, that acts of Congress or treaties have not permitted Chinese persons born out of this country to become citizens by naturalization, cannot exclude Chinese persons born in this country from the operation of the broad and clear words of the Constitution, "All persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States."

VII. Upon the facts agreed in this case, the American citizenship which Wong Kim Ark acquired by birth within the United States has not been lost or taken away by anything happening since his birth. No doubt he might himself, after coming of age, renounce this citizenship, and become a citizen of the country of his parents, or of any other country; for by our law, as solemnly declared by Congress, "the right of expatriation is a natural and inherent right of all people," and "any declaration, instruction, opinion, order or direction of any officer of the United States, which denies, restricts, impairs or questions the right of expatriation, is declared inconsistent with the fundamental principles of the Republic." Rev. Stat. § 1999, reënacting act of July 27, 1868, c. 249, § 1; 15 Stat. 223, 224. Whether any act of himself, or of his parents, during his minority, could have the same effect, is at least doubtful. But it would be out of place to pursue that inquiry; inasmuch as it is expressly agreed that his residence has always been in the United States, and not elsewhere; that each of his temporary visits to China, the one for some months when he was about seventeen years old, and the other for something like a year about the time of his coming of age, was made with the intention of returning, and was followed by his actual return, to the United States; and "that said Wong Kim Ark has not, either by himself or his parents act-

ing for him, ever renounced his allegiance to the United States, and that he has never done or committed any act or thing to exclude him therefrom."

The evident intention, and the necessary effect, of the submission of this case to the decision of the court upon the facts agreed by the parties, were to present for determination the single question, stated at the beginning of this opinion, namely, whether a child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, but have a permanent domicil and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity under the Emperor of China, becomes at the time of his birth a citizen of the United States. For the reasons above stated, this court is of opinion that the question must be answered in the affirmative.

*Order affirmed.*

MR. CHIEF JUSTICE FULLER, with whom concurred MR. JUSTICE HARLAN, dissenting.

I cannot concur in the opinion and judgment of the court in this case.

The proposition is that a child born in this country of parents who were not citizens of the United States, and under the laws of their own country and of the United States could not become such — as was the fact from the beginning of the Government in respect of the class of aliens to which the parents in this instance belonged — is, from the moment of his birth a citizen of the United States, by virtue of the first clause of the Fourteenth Amendment, any act of Congress to the contrary notwithstanding.

The argument is, that although the Constitution prior to that amendment nowhere attempted to define the words "citizens of the United States" and "natural-born citizen" as used therein, yet that it must be interpreted in the light of the English common law rule which made the place of birth the criterion of nationality; that that rule "was in force in all

the English colonies upon this continent down to the time of the Declaration of Independence, and in the United States afterwards, and continued to prevail under the Constitution as originally established;" and " that before the enactment of the Civil Rights Act of 1866 and the adoption of the Constitutional Amendment, all white persons, at least, born within the sovereignty of the United States, whether children of citizens or of foreigners, excepting only children of ambassadors or public ministers of a foreign Government, were native-born citizens of the United States."

Thus the Fourteenth Amendment is held to be merely declaratory except that it brings all persons, irrespective of color, within the scope of the alleged rule, and puts that rule beyond the control of the legislative power.

If the conclusion of the majority opinion is correct, then the children of citizens of the United States, who have been born abroad since July 28, 1868, when the amendment was declared ratified, were, and are, aliens, unless they have, or shall on attaining majority, become citizens by naturalization *in* the United States; and no statutory provision to the contrary is of any force or effect. And children who are aliens by descent, but born on our soil, are exempted from the exercise of the power to exclude or to expel aliens, or any class of aliens, so often maintained by this court, an exemption apparently disregarded by the acts in respect of the exclusion of persons of Chinese descent.

The English common law rule, which it is insisted was in force after the Declaration of Independence, was that " every person born within the dominions of the Crown, no matter whether of English or of foreign parents, and, in the latter case, whether the parents were settled or merely temporarily sojourning in the country, was an English subject; save only the children of foreign ambassadors, (who were excepted because their fathers carried their own nationality with them,) or a child born to a foreigner during the hostile occupation of any part of the territories of England." Cockburn on Nationality, 7.

The tie which bound the child to the Crown was indissolu-

ble. The nationality of his parents had no bearing on his nationality. Though born during a temporary stay of a few days, the child was irretrievably a British subject. Hall on Foreign Jurisdiction, etc., § 15.

The rule was the outcome of the connection in feudalism between the individual and the soil on which he lived, and the allegiance due was that of liegemen to their liege lord. It was not local and temporary as was the obedience to the laws owed by aliens within the dominions of the Crown, but permanent and indissoluble, and not to be cancelled by any change of time or place or circumstances.

And it is this rule, pure and simple, which it is asserted determined citizenship of the United States during the entire period prior to the passage of the act of April 9, 1866, and the ratification of the Fourteenth Amendment, and governed the meaning of the words " citizen of the United States " and " natural-born citizen " used in the Constitution as originally framed and adopted. I submit that no such rule obtained during the period referred to, and that those words bore no such construction; that the act of April 9, 1866, expressed the contrary rule; that the Fourteenth Amendment prescribed the same rule as the act; and that if that amendment bears the construction now put upon it, it imposed the English common law rule on this country for the first time and made it " absolute and unbending," just as Great Britain was being relieved from its inconveniences.

Obviously, where the Constitution deals with common law rights and uses common law phraseology, its language should be read in the light of the common law; but when the question arises as to what constitutes citizenship of the nation, involving as it does international relations, and political as contradistinguished from civil status, international principles must be considered, and, unless the municipal law of England appears to have been affirmatively accepted, it cannot be allowed to control in the matter of construction.

Nationality is essentially a political idea, and belongs to the sphere of public law. Hence Mr. Justice Story, in *Shanks* v. *Dupont*, 3 Pet. 242, 248, said that the incapacities of femes

covert, at common law, "do not reach their political rights, nor prevent their acquiring or losing a national character. Those political rights do not stand upon the mere doctrines of municipal law, applicable to ordinary transactions, but stand upon the more general principles of the law of nations."

Twiss in his work on the Law of Nations says that " natural allegiance, or the obligation of perpetual obedience to the government of a country, wherein a man may happen to have been born, which he cannot forfeit, or cancel, or vary by any change of time, or place, or circumstance, is the creature of civil law, and finds no countenance in the law of nations, as it is in direct conflict with the incontestable rule of that law." Vol. 1, p. 231.

Before the Revolution, the views of the publicists had been thus put by Vattel: " The natives, or natural-born citizens, are those born in the country, of parents who are citizens. As the society cannot exist and perpetuate itself otherwise than by the children of the citizens, those children naturally follow the condition of their fathers, and succeed to all their rights. The society is supposed to desire this, in consequence of what it owes to its own preservation; and it is presumed, as matter of course, that each citizen, on entering into society, reserves to his children the right of becoming members of it. The country of the fathers is therefore that of the children; and these become true citizens merely by their tacit consent. We shall soon see whether, on their coming to the years of discretion, they may renounce their right, and what they owe to the society in which they were born. I say that, in order to be of the country, it is necessary that a person be born of a father who is a citizen; for, if he is born there of a foreigner, it will be only the place of his birth, and not his country." Book I, c. 19, § 212. "The true bond which connects the child with the body politic is not the matter of an inanimate piece of land, but the moral relations of his parentage. . . . The place of birth produces no change in the rule that children follow the condition of their fathers, for it is not naturally the place of birth that gives rights, but extraction."

And to the same effect are the modern writers, as for in-

stance, Bar, who says: "To what nation a person belongs is by the laws of all nations closely dependent on descent; it is almost an universal rule that the citizenship of the parents determines it — that of the father where children are lawful, and where they are bastards that of their mother, without regard to the place of their birth ; and that must necessarily be recognized as the correct canon, since nationality is in its essence dependent on descent." Int. Law, § 31.

The framers of the Constitution were familiar with the distinctions between the Roman law and the feudal law, between obligations based on territoriality and those based on the personal and invisible character of origin, and there is nothing to show that in the matter of nationality they intended to adhere to principles derived from regal government, which they had just assisted in overthrowing.

Manifestly, when the sovereignty of the Crown was thrown off and an independent government established, every rule of the common law and every statute of England obtaining in the Colonies, in derogation of the principles on which the new government was founded, was abrogated.

The States, for all national purposes embraced in the Constitution, became one, united under the same sovereign authority, and governed by the same laws, but they retained their jurisdiction over all persons and things within their territorial limits, except where surrendered to the General Government or restrained by the Constitution, and protection to life, liberty and property rested primarily with them. So far as the *jus commune*, or *folk-right*, relating to the rights of persons, was concerned, the Colonies regarded it as their birthright, and adopted such parts of it as they found applicable to their condition. *Van Ness* v. *Pacard*, 2 Pet. 137.

They became sovereign and independent States, and when the Republic was created each of the thirteen States had its own local usages, customs and common law, while in respect of the National Government there necessarily was no general, independent and separate common law of the United States, nor has there ever been. *Wheaton* v. *Peters*, 8 Pet. 591, 658.

As to the *jura coronæ*, including therein the obligation of allegiance, the extent to which these ever were applicable in this country depended on circumstances, and it would seem quite clear that the rule making locality of birth the criterion of citizenship because creating a permanent tie of allegiance, no more survived the American Revolution than the same rule survived the French Revolution.

Doubtless, before the latter event, in the progress of monarchical power, the rule which involved the principle of liege homage may have become the rule of Europe; but that idea never had any basis in the United States.

As Chief Justice Taney observed in *Fleming* v. *Page*, 9 How. 603, 618, though in a different connection: " It is true that most of the States have adopted the principles of English jurisprudence, so far as it concerns private and individual rights. And when such rights are in question, we habitually refer to the English decisions, not only with respect, but in many cases as authoritative. But in the distribution of political power between the great departments of· government, there is such a wide difference between the power conferred on the President of the United States and the authority and sovereignty which belong to the English Crown, that it would be altogether unsafe to reason from any supposed resemblance between them, either as regards conquest in war, or any other subject where the rights and powers of the executive arm of the government are brought into question. Our own Constitution and form of government must be our only guide."

And Mr. Lawrence, in his edition of Wheaton (Lawrence's Wheaton, p. 920), makes this comment: " There is, it is believed, as great a difference between the territorial allegiance claimed by an hereditary sovereign on feudal principles, and the personal right of citizenship participated in by all the members of the political community, according to American institutions, as there is between the authority and sovereignty of the Queen of England, and the power of the American President; and the inapplicability of English precedents is as clear in the one case as in the other. The same view, with particular application to naturalization, was early taken by

the American commentator on Blackstone. Tucker's Blackstone, Vol. 1, Pt. 2, Appx. p. 96."

Blackstone distinguished allegiance into two sorts, the one natural and perpetual; the other local and temporary. Natural allegiance, so-called, was allegiance resulting from birth in subjection to the Crown, and indelibility was an essential, vital and necessary characteristic.

The Royal Commission to inquire into the Laws of Naturalization and Allegiance was created May 21, 1868; and, in their report, the Commissioners, among other things, say: "The allegiance of a natural-born British subject is regarded by the Common Law as indelible. We are of opinion that this doctrine of the Common Law is neither reasonable nor convenient. It is at variance with those principles on which the rights and duties of a subject should be deemed to rest; it conflicts with that freedom of action which is now recognized as most conducive to the general good as well as to individual happiness and prosperity; and it is especially inconsistent with the practice of a State which allows to its subjects absolute freedom of emigration."

However, the Commission by a majority declined to recommend the abandonment of the rule altogether though "clearly of opinion that it ought not to be, as it now is, absolute and unbending;" but recommended certain modifications which were carried out in subsequent legislation.

But from the Declaration of Independence to this day, the United States have rejected the doctrine of indissoluble allegiance and maintained the general right of expatriation, to be exercised in subordination to the public interests and subject to regulation.

As early as the act of January 29, 1795, c. 20, 1 Stat. 414, applicants for naturalization were required to take not simply an oath to support the Constitution of the United States, but of absolute renunciation and abjuration of all allegiance and fidelity to every foreign prince or State, and particularly to the prince or State of which they were before the citizens or subjects.

The statute 3 Jac. 1, c. 4, provided that promising obedience

to any other prince, State or potentate subjected the person so doing to be adjudged a traitor, and to suffer the penalty of high treason; and in respect of the act of 1795 Lord Grenville wrote to our minister, Rufus King : "No British subject can, by such a form of renunciation as that which is prescribed in the American law of naturalization, divest himself of his allegiance to his sovereign. Such a declaration of renunciation made by any of the King's subjects would, instead of operating as a protection to them, be considered an act highly criminal on their part." 2 Amer. St. Pap. 149. And see *Fitch* v. *Weber*, 6 Hare, 51.

Nevertheless, Congress has persisted from 1795 in rejecting the English rule and in requiring the alien, who would become a citizen of the United States, in taking on himself the ties binding him to our Government, to affirmatively sever the ties that bound him to any other.

The subject was examined at length in 1856, in an opinion given the Secretary of State by Attorney General Cushing, 8 Opins. Attys. Gen. 139, where the views of the writers on international law and those expressed in cases in the Federal and state courts are largely set forth, and the Attorney General says : "The doctrine of absolute and perpetual allegiance, the root of the denial of any right of emigration, is inadmissible in the United States. It was a matter involved in, and settled for us by the Revolution, which founded the American Union.

"Moreover, the right of expatriation, under fixed circumstances of time and of manner, being expressly asserted in the legislatures of several of the States, and confirmed by decisions of their courts, must be considered as thus made a part of the fundamental law of the United States."

Expatriation included not simply the leaving of one's native country, but the becoming naturalized in the country adopted as a future residence. The emigration which the United States encouraged was that of those who could become incorporate with its people; make its flag their own; and aid in the accomplishment of a common destiny; and it was obstruction to such emigration that made one of the charges against the Crown in the Declaration.

*Ainslie* v. *Martin*, 9 Mass. 454, 460, (1813); *Murray* v. *McCarty*, 2 Munf. 393, (1811); *Alsberry* v. *Hawkins*, 9 Dana, 177, (1839) are among the cases cited. In *Ainslie* v. *Martin*, the indelibility of allegiance according to the common law rule was maintained; while in *Murray* v. *McCarty* and *Alsberry* v. *Hawkins*, the right of expatriation was recognized as a practical and fundamental doctrine of America. There was no uniform rule so far as the States were severally concerned, and none such assumed in respect of the United States.

In 1859, Attorney General Black thus advised the President (9 Op. 356): " The natural right of every free person, who owes no debts and is not guilty of any crime, to leave the country of his birth in good faith and for an honest purpose, the privilege of throwing off his natural allegiance and substituting another allegiance in its place — the general right, in one word, of expatriation, is incontestable. I know that the common law of England denies it; that the judicial decisions of that country are opposed to it; and that some of our own courts, misled by British authority, have expressed, though not very decisively, the same opinion. But all this is very far from settling the question. The municipal code of England is not one of the sources from which we derive our knowledge of international law. We take it from natural reason and justice, from writers of known wisdom, and from the practice of civilized nations. All these are opposed to the doctrine of perpetual allegiance."

In the opinion of the Attorney General, the United States, in recognizing the right of expatriation, declined, from the beginning, to accept the view that rested the obligation of the citizen on feudal principles, and proceeded on the law of nations, which was in direct conflict therewith.

And the correctness of this conclusion was specifically affirmed not many years after, when the right as the natural and inherent right of all people and fundamental in this country, was declared by Congress in the act of July 27, 1868, 15 Stat. 223, c. 249, carried forward into sections 1999 and 2000 of the Revised Statutes, in 1874.

It is beyond dispute that the most vital constituent of the English common law rule has always been rejected in respect of citizenship of the United States.

Whether it was also the rule at common law that the children of British subjects born abroad were themselves British subjects — nationality being attributed to parentage instead of locality — has been variously determined. If this were so, of course the statute of Edw. III was declaratory, as was the subsequent legislation. But if not, then such children were aliens, and the statute of 7 Anne and subsequent statutes must be regarded as in some sort acts of naturalization. On the other hand, it seems to me that the rule *partus sequitur patrem* has always applied to children of our citizens born abroad and that the acts of Congress on this subject are clearly declaratory, passed out of abundant caution to obviate misunderstandings which might arise from the prevalence of the contrary rule elsewhere.

Section 1993 of the Revised Statutes provides that children so born "are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States." Thus a limitation is prescribed on the passage of citizenship by descent beyond the second generation if then surrendered by permanent non-residence, and this limitation was contained in all the acts from 1790 down. Section 2172 provides that such children shall "be considered as citizens thereof."

The language of the statute of 7 Anne, c. 5, is quite different in providing that, "the children of all natural-born subjects born out of the ligeance of Her Majesty, her heirs and successors, shall be deemed, adjudged and taken to be natural-born subjects of this kingdom, to all intents, constructions and purposes whatsoever."

In my judgment, the children of our citizens born abroad were always natural-born citizens from the standpoint of this Government. If not, and if the correct view is that they were aliens but collectively naturalized under the acts of Congress which recognized them as natural-born, then those born since the Fourteenth Amendment are not citizens at all,

unless they have become such by individual compliance with the general laws for the naturalization of aliens, because they are not naturalized " *in* the United States."

By the fifth clause of the first section of article two of the Constitution it is provided that: "No person except a natural-born citizen, or a citizen of the United States, at the time of the adoption of the Constitution, shall be eligible to the office of President; neither shall any person be eligible to that office who shall not have attained to the age of thirty-five years, and been fourteen years a resident within the United States."

In the convention it was, says Mr. Bancroft, " objected that no number of years could properly prepare a foreigner for that place; but as men of other lands had spilled their blood in the cause of the United States, and had assisted at every stage of the formation of their institutions, on the seventh of September, it was unanimously settled that foreign-born residents of fourteen years who should be citizens at the time of the formation of the Constitution are eligible to the office of President." 2 Bancroft Hist. U. S. Const. 193.

Considering the circumstances surrounding the framing of the Constitution, I submit that it is unreasonable to conclude that " natural-born citizen " applied to everybody born within the geographical tract known as the United States, irrespective of circumstances; and that the children of foreigners, happening to be born to them while passing through the country, whether of royal parentage or not, or whether of the Mongolian, Malay or other race, were eligible to the Presidency, while children of our citizens, born abroad, were not.

By the second clause of the second section of article one it is provided that : "No person shall be a representative who shall not have attained to the age of twenty-five years, and been seven years a citizen of the United States, and who shall not, when elected, be an inhabitant of that State of which he shall be chosen;" and by the third clause of section three, that : "No person shall be a senator who shall not have attained to the age of thirty years, and been nine years a citizen of the United States, and who shall not, when elected, be an inhabitant of that State for which he shall be chosen."

At that time the theory largely obtained, as stated by Mr. Justice Story, in his Commentaries on the Constitution, "that every citizen of a State is *ipso facto* a citizen of the United States." § 1693.

Mr. Justice Curtis, in *Dred Scott* v. *Sandford*, 19 How. 396, 576, expressed the opinion that under the Constitution of the United States "every free person born on the soil of a State, who is a citizen of that State by force of its Constitution or laws, is also a citizen of the United States." And he said: "Among the powers unquestionably possessed by the several States was that of determining what persons should and what persons should not be citizens. It was practicable to confer on the Government of the Union this entire power. It embraced what may, well enough for the purpose now in view, be divided into three parts. *First:* The power to remove the disabilities of alienage, either by special acts in reference to each individual case, or by establishing a rule of naturalization to be administered and applied by the courts. *Second:* Determining what persons should enjoy the privileges of citizenship, in respect to the internal affairs of the several States. *Third:* What native-born persons should be citizens of the United States.

"The first-named power, that of establishing a uniform rule of naturalization, was granted; and here the grant, according to its terms, stopped. Construing a Constitution containing only limited and defined powers of government, the argument derived from this definite and restricted power to establish a rule of naturalization must be admitted to be exceedingly strong. I do not say it is necessarily decisive. It might be controlled by other parts of the Constitution. But when this particular subject of citizenship was under consideration, and, in the clause specially intended to define the extent of power concerning it, we find a particular part of this entire power separated from the residue, and conferred on the General Government, there arises a strong presumption that this is all which is granted, and that the residue is left to the States and to the people. And this presumption is, in my opinion, converted into a certainty, by an examination of all such other clauses of the Constitution as touch this subject."

But in that case Mr. Chief Justice Taney said: "The words 'people of the United States' and 'citizens' are synonymous terms, and mean the same thing. They both describe the po- litical body who, according to our republican institutions, form the sovereignty, and who hold the power and conduct the gov- ernment through their representatives. They are what we familiarly call the 'sovereign people' and every citizen is one of this people and a constituent member of this sovereignty. . . . In discussing this question, we must not confound the rights of citizenship which a State may confer within its own limits, and the rights of citizenship as a member of the Union. It does not by any means follow, because he has all the rights and privileges of a citizen of a State, that he must be a citizen of the United States. He may have all of the rights and privi- leges of a citizen of a State, and yet not be entitled to the rights and privileges of a citizen in any other State. For, pre- vious to the adoption of the Constitution of the United States, every State had the undoubted right to confer on whomsoever it pleased the character of citizen and to endow him with all its rights. But this character of course was confined to the boundaries of the State, and gave him no rights or privileges in other States beyond those secured to him by the laws of nations and the comity of States. Nor have the several States surrendered the power of conferring these rights and privileges by adopting the Constitution of the United States. Each State may still confer them upon an alien, or any one it thinks proper, or upon any class or description of persons; yet he would not be a citizen in the sense in which that word is used in the Constitution of the United States, nor entitled to sue as such in one of its courts, nor to the privileges and immunities of a citizen in the other States. The rights which he would acquire would be restricted to the State which gave them. The Constitution has conferred on Congress the right to estab- lish an uniform rule of naturalization, and this right is evi- dently exclusive, and has always been held by this court to be so. Consequently, no State, since the adoption of the Consti- tution, can by naturalizing an alien invest him with the rights and privileges secured to a citizen of a State under the Federal

Government, although, so far as the State alone was concerned, he would undoubtedly be entitled to the rights of a citizen, and clothed with all the rights and immunities which the Constitution and laws of the State attached to that character."

Plainly the distinction between citizenship of the United States and citizenship of a State thus pointed out, involved then, as now, the complete rights of the citizen internationally as contradistinguished from those of persons not citizens of the United States.

The English common law rule recognized no exception in the instance of birth during the mere temporary or accidental sojourn of the parents. As allegiance sprang from the place of birth regardless of parentage and supervened at the moment of birth, the inquiry whether the parents were permanently or only temporarily within the realm was wholly immaterial. And it is settled in England that the question of domicil is entirely distinct from that of allegiance. The one relates to the civil, and the other to the political status. *Udny* v. *Udny*, L. R. 1 H. L. Sc. 441, 457.

But a different view as to the effect of permanent abode on ·nationality has been expressed in this country.

In his work on Conflict of Laws, § 48, Mr. Justice Story, treating the subject as one of public law, said: "Persons who are born in a country are generally deemed to be citizens of that country. A reasonable qualification of the rule would seem to be that it should not apply to the children of parents who were *in itinere* in the country, or who were abiding there for temporary purposes, as for health or curiosity, or occasional business. It would be difficult, however, to assert that in the present state of public law such a qualification is universally established."

Undoubtedly all persons born in a country are presumptively citizens thereof, but the presumption is not irrebutable.

In his Lectures on Constitutional Law, p. 279, Mr. Justice Miller remarked: "If a stranger or traveller passing through, or temporarily residing in this country, who has not himself been naturalized, and who claims to owe no allegiance to our Government, has a child born here which goes out of the coun-

try with its father, such child is not a citizen of the United States, because it was not subject to its jurisdiction."

And to the same effect are the rulings of Mr. Secretary Frelinghuysen in the matter of Hausding, and Mr. Secretary Bayard in the matter of Greisser.

Hausding was born in the United States, went to Europe, and, desiring to return, applied to the minister of the United States for a passport, which was refused on the ground that the applicant was born of Saxon subjects temporarily in the United States.  Mr. Secretary Frelinghuysen wrote to Mr. Kasson, our minister: "You ask 'Can one born a foreign subject, but within the United States, make the option after his majority, and while still living abroad, to adopt the citizenship of his birthplace? It seems not; and that he must change his allegiance by emigration and legal process of naturalization.' Sections 1992 and 1993 of the Revised Statutes clearly show the extent of existing legislation; that the fact of birth, under circumstances implying alien subjection, establishes of itself no right of citizenship; and that the citizenship of a person so born is to be acquired in some legitimate manner through the operation of statute.  No statute contemplates the acquisition of the declared character of an American citizen by a person not at the time within the jurisdiction of the tribunal of record which confers that character."

Greisser was born in the State of Ohio in 1867, his father being a German subject and domiciled in Germany, to which country the child returned.  After quoting the act of 1866 and the Fourteenth Amendment, Mr. Secretary Bayard said: " Richard Greisser was no doubt born in the United States, but he was on his birth 'subject to a foreign power,' and 'not subject to the jurisdiction of the United States.' He was not, therefore, under the statute and the Constitution a citizen of the United States by birth; and it is not pretended that he has any other title to citizenship." 2 Whart. Int. Dig. 399.

The Civil Rights Act became a law April 9, 1866 (14 Stat. 27, c. 31), and provided : "That all persons born in the United States and not subject to any foreign power, excluding Indians

not taxed, are hereby declared to be citizens of the United States." And this was reënacted June 22, 1874, in the Revised Statutes, section 1992.

The words "not subject to any foreign power" do not in themselves refer to mere territorial jurisdiction, for the persons referred to are persons born in the United States. All such persons are undoubtedly subject to the territorial jurisdiction of the United States, and yet the act concedes that nevertheless they may be subject to the political jurisdiction of a foreign government. In other words, by the terms of the act all persons born in the United States, and not owing allegiance to any foreign power, are citizens.

The allegiance of children so born is not the local allegiance arising from their parents merely being domiciled in the country, and it is single and not double allegiance. Indeed double allegiance in the sense of double nationality has no place in our law, and the existence of a man without a country is not recognized.

But it is argued that the words "and not subject to any foreign power" should be construed as excepting from the operation of the statute only the children of public ministers and of aliens born during hostile occupation.

Was there any necessity of excepting them? And if there were others described by the words, why should the language be construed to exclude them?

Whether the immunity of foreign ministers from local allegiance rests on the fiction of extra-territoriality or on the waiver of territorial jurisdiction by receiving them as representatives of other sovereignties, the result is the same.

They do not owe allegiance otherwise than to their own governments, and their children cannot be regarded as born within any other.

And this is true as to the children of aliens within territory in hostile occupation, who necessarily are not under the protection of, nor bound to render obedience to, the sovereign whose domains are invaded; but it is not pretended that the children of citizens of a government so situated would not become its citizens at their birth, as the permanent allegiance

of their parents would not be severed by the mere fact of the enemy's possession.

If the act of 1866 had not contained the words, "and not subject to any foreign power," the children neither of public ministers nor of aliens in territory in hostile occupation would have been included within its terms on any proper construction, for their birth would not have subjected them to ties of allegiance,. whether local and temporary, or general and permanent.

There was no necessity as to them for the insertion of the words although they were embraced by them.

But there were others in respect of whom .the exception was needed, namely, the children of aliens, whose parents owed local and temporary allegiance merely, remaining subject to a foreign power by virtue of the tie of permanent allegiance, which they had not severed by formal abjuration or equivalent conduct, and some of whom were not permitted to do so if they, would.

And it was to prevent the acquisition of citizenship by the children of such aliens merely by birth within the geographical limits of the United States that the words were inserted.

Two months after the statute was enacted, on June 16, 1866, the Fourteenth Amendment was proposed, and declared ratified July 28, 1868. The first clause of the first section reads: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." The act was passed and the amendment proposed by the same Congress, and it is not open to reasonable doubt that the words "subject to the jurisdiction thereof" in the amendment were used as synonymous with the words "and not subject to any foreign power" of the act.

The jurists and statesmen referred to in the majority opinion, notably Senators. Trumbull and Reverdy Johnson, concurred in that view, Senator Trumbull saying: "What do we mean by 'subject to the jurisdiction of the United States'? Not owing allegiance to anybody else; that is what it means." And Senator Johnson: "Now, all that this amendment pro-

vides is that all persons born within the United States and not subject to some foreign power — for that no doubt is the meaning of the committee who have brought the matter before us — shall be considered as citizens of the United States." Cong. Globe, 1st Sess. 39th Cong., 2893 *et seq.*

, This was distinctly so ruled in *Elk* v. *Wilkins*, 112 U. S. 94; and no reason is perceived why the words were used if they apply only to that obedience which all persons, not possessing immunity therefrom, must pay the laws of the country in which they happen to be.

Dr. Wharton says that the words "subject to the jurisdiction" must be construed in the sense which international law attributes to them, but that the children of our citizens born abroad, and of foreigners born in the United States have the right on arriving at full age to elect one allegiance and repudiate the other. Whart. Conflict of Laws, §§ 10, 11, 12.

The Constitution and statutes do not contemplate double allegiance, and how can such election be determined? By section 1993 of the Revised Statutes, the citizenship of the children of our citizens born abroad may be terminated in that generation by their persistent abandonment of their country; while by sections 2167 and 2168, special provision is made for the naturalization of alien minor residents, on attaining majority, by dispensing with the previous declaration of intention and allowing three years of minority on the five years' residence required; and also for the naturalization of children of aliens whose parents have died after making declaration of intention. By section 2172 children of naturalized citizens are to be considered citizens.

While then the naturalization of the father carries with it that of his minor children, and his declaration of intention relieves them from the preliminary steps for naturalization, and minors are allowed to count part of the residence of their minority on the whole term required and are relieved from the declaration of intention, the statutes make no provision for formal declaration of election by children born in this country of alien parents on attaining majority.

The point, however, before us, is whether permanent alle-

giance is imposed at birth without regard to circumstances — permanent until thrown off and another allegiance acquired by formal acts — not local and determined by a mere change of domicil.

The Fourteenth Amendment came before the court in *The Slaughterhouse Cases*, 16 Wall. 36, 73, at December term, 1872 (the cases having been brought up by writ of error in May, 1870, 10 Wall. 273), and it was held that the first clause was intended to define citizenship of the United States and citizenship of a State, which definitions recognized the distinction between the one and the other; that the privileges and immunities of citizens of the States embrace generally those fundamental civil rights for the security of which organized society was instituted, and which remain, with certain exceptions mentioned in the Federal Constitution, under the care of the state governments; while the privileges and immunities of citizens of the United States are those which arise out of the nature and essential character of the National Government, the provisions of its Constitution, or its laws and treaties made in pursuance thereof; and that it is the latter which are placed under the protection of Congress by the second clause.

And Mr. Justice Miller, delivering the opinion of the court, in analyzing the first clause, observed that "the phrase 'subject to the jurisdiction thereof' was intended to exclude from its operation children of ministers, consuls and citizens or subjects of foreign States, born within the United States."

That eminent judge did not have in mind the distinction between persons charged with diplomatic functions and those who were not, but was well aware that consuls are usually the citizens or subjects of the foreign States from which they come, and that, indeed, the appointment of natives of the places where the consular service is required, though permissible, has been pronounced objectionable in principle.

His view was that the children of "citizens or subjects of foreign States," owing permanent allegiance elsewhere and only local obedience here, are not otherwise subject to the jurisdiction of the United States than are their parents.

· Mr. Justice Field dissented from the judgment of the court, and subsequently in the case of *Look Tin Sing*, 10 Sawyer, 353, in the Circuit Court for the District of California, held children born of Chinese parents in the United States to be citizens, and the cases subsequently decided in the Ninth Circuit followed that ruling. Hence the conclusion in this case which the able opinion of the District Judge shows might well have been otherwise.

I do not insist that, although what was said was deemed essential to the argument and a necessary part of it, the point was definitively disposed of in the *Slaughterhouse Cases*, particularly as Chief Justice Waite in *Minor* v. *Happersett*, 21 Wall. 162, 167, remarked that there were doubts, which for the purposes of the case then in hand it was· not necessary to solve. But that solution is furnished in *Elk* v. *Wilkins*, 112 U. S. 94, 101, where the subject received great consideration and it was said :·

" By the Thirteenth Amendment of the Constitution slavery was prohibited. The main object of the opening sentence of the Fourteenth Amendment was to settle the question, upon which there had been a difference of opinion throughout the country and in this court, as to the citizenship of free negroes, *Scott* v. *Sandford*, 19 How. 393; and to put it beyond doubt that all persons, white or black, and whether formerly slaves or not, born or naturalized in the United States, and *owing no allegiance to any alien power*, should be citizens of the United States, and of the State in which they reside. *Slaughterhouse Cases*, 16 Wall. 36, 73; *Strauder* v. *West Virginia*, 100 U. S. 303, 306.

" This section contemplates two sources of citizenship, and two sources only : birth and naturalization. The persons declared to be citizens are ' all persons born or naturalized in the United States, and subject to the jurisdiction thereof.' The evident meaning of these last words is, not merely subject in some respect or degree to the jurisdiction of the United States, but *completely subject to their political jurisdiction*, and *owing them direct and immediate allegiance*. And the words relate to the time of birth in the one case, as they do

to the time of naturalization in the other. *Persons not thus subject to the jurisdiction of the United States at the time of birth* cannot become so afterwards, except by being naturalized, either individually, as by proceedings under the naturalization acts, or collectively, as by the force of a treaty by which foreign territory is acquired."

To be "completely subject" to the political jurisdiction of the United States is to be in no respect or degree subject to the political jurisdiction of any other government.

Now I take it that the children of aliens, whose parents have not only not renounced their allegiance to their native country, but are forbidden by its system of government, as well as by its positive laws, from doing so, and are not permitted to acquire another citizenship by the laws of the country into which they come, must necessarily remain themselves subject to the same sovereignty as their parents, and cannot, in the nature of things, be, any more than their parents, completely subject to the jurisdiction of such other country.

Generally speaking, I understand the subjects of the Emperor of China — that ancient Empire, with its history of thousands of years and its unbroken continuity in belief, traditions and government, in spite of revolutions and changes of dynasty — to be bound to him by every conception of duty and by every principle of their religion, of which filial piety is the first and greatest commandment; and formerly, perhaps still, their penal laws denounced the severest penalties on those who renounced their country and allegiance, and their abettors; and, in effect, held the relatives at home of Chinese in foreign lands as hostages for their loyalty.[1]    And

---

[1] The fundamental laws of China have remained practically unchanged since the second century before Christ. The statutes have from time to time undergone modifications, but there does not seem to be any English or French translation of the Chinese Penal Code later than that by Staunton, published in 1810. That code provided: " All persons renouncing their country and allegiance, or devising the means thereof, shall be beheaded; and in the punishment of this offence, no distinction shall be made between principals and accessories. The property of all such criminals shall be confiscated, and their wives and children distributed as slaves to the great officers of State. . . . The parents, grandparents, brothers and grand-

whatever concession may have been made by treaty in the
direction of admitting the right of expatriation in some sense,
they seem in the United States to have remained pilgrims and
sojourners as all their fathers were.  149 U. S. 717.  At all
events, they have never been allowed by our laws to acquire
our nationality, and, except in sporadic instances, do not ap-
pear ever to have desired to do so.

The Fourteenth Amendment was not designed to accord
citizenship to persons so situated and to cut off the legislative
power from dealing with the subject.

The right of a nation to expel or deport foreigners who have
not been naturalized or taken any steps toward becoming citi-
zens of a country, is as absolute and unqualified as the right
to prohibit and prevent their entrance into the country.  149
U. S. 707.

But can the persons expelled be subjected to "cruel and
unusual punishments" in the process of expulsion, as would
be the case if children born to them in this country were
separated from them on their departure, because citizens of
the United States?  Was it intended by this amendment to
tear up parental relations by the roots?

The Fifteenth Amendment provides that "the right of citi-
zens of the United States to vote shall not be denied or abridged
by the United States or by any State on account of race, color
or previous condition of servitude."  Was it intended thereby
that children of aliens should, by virtue of being born in the

---

children of such criminals, whether habitually living with them under the
same roof or not, shall be perpetually banished to the distance of 2000 *lee*.

"All those who purposely conceal and connive at the perpetration of this
crime, shall be strangled.  Those who inform against, and bring to justice,
criminals of this description, shall be rewarded with the whole of their
property.

"Those who are privy to the perpetration of this crime, and yet omit to
give any notice or information thereof to the magistrates, shall be punished
with 100 blows and banished perpetually to the distance of 3000 *lee*.

"If the crime is contrived, but not executed, the principal shall be
strangled, and all the accessories shall, each of them, be punished with 100
blows, and perpetual banishment to the distance of 3000 *lee*. . . ."
Staunton's Penal Code of China, 272, § 255.

United States, be entitled on attaining majority to vote irre-spective of the treaties and laws of the United States in regard to such aliens?

In providing that persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens, the Fourteenth Amendment undoubtedly had particular reference to securing citizenship to the members of the colored race, whose servile status had been obliterated by the Thirteenth Amendment, and who had been born in the United States, but were not and never had been subject to any foreign power. They were not aliens, (and even if they could be so regarded, this operated as a collective naturalization,) and their political status could not be affected by any change of the laws for the naturalization of individuals.

Nobody can deny that the question of citizenship in a nation is of the most vital importance. It is a precious heri-tage, as well as an inestimable acquisition; and I cannot think that any safeguard surrounding it was intended to be thrown down by the amendment.

In suggesting some of the privileges and immunities of national citizenship, in the *Slaughterhouse Cases* Mr. Justice Miller said: " Another privilege of a citizen of the United States is to demand the care and protection of the Federal Government over his life, liberty and property when on the high seas or within the jurisdiction of a foreign government. Of this there can be no doubt, nor that the right depends upon his character as a citizen of the United States."

Mr. Hall says in his work on Foreign Jurisdiction, etc., §§ 2, 5, the principle is that " the legal relations by which a per-son is encompassed in his country of birth and residence can-not be wholly put aside when he goes abroad for a time; many of the acts which he may do outside his native state have in-evitable consequences within it. He may for many purposes be temporarily under the control of another sovereign than his own, and he may be bound to yield to a foreign govern-ment a large measure of obedience; but his own State still possesses a right to his allegiance; he is still an integral part of the national community. A State therefore can enact laws,

enjoining or forbidding acts, and defining legal relations, which apply to its subjects abroad in common with those within its dominions. It can declare under what conditions it will regard as valid, acts done in foreign countries, which profess to have legal effect; it can visit others with penalties; it can estimate circumstances and facts as it chooses." On the other hand, the "duty of protection is correlative to the rights of a sovereign over his subjects; the maintenance of a bond between a State and its subjects while they are abroad implies that the former must watch over and protect them within the due limit of the rights of other States. . . . It enables governments to exact reparation for oppression from which their subjects have suffered, or for injuries done to them otherwise than by process of law; and it gives the means of guarding them against the effect of unreasonable laws, of laws totally out of harmony with the nature or degree of civilization by which a foreign power affects to be characterized, and finally of an administration of the laws had beyond a certain point. When in these directions a State grossly fails in its duties; when it is either incapable of ruling, or rules with patent injustice, the right of protection emerges in the form of diplomatic remonstrance, and in extreme cases of ulterior measures. It provides a material sanction for rights; it does not offer a theoretic foundation. It does not act within a foreign territory with the consent of the sovereign; it acts against him contentiously from without."

The privileges or immunities which, by the second clause of the amendment, the States are forbidden to abridge are the privileges or immunities pertaining to citizenship of the United States, but that clause also places an inhibition on the States from depriving any person of life, liberty or property, and from denying "to any person within its jurisdiction, the equal protection of the laws," that is, of its own laws — the laws to which its own citizens are subjected.

The jurisdiction of the State is necessarily local, and the limitation relates to rights primarily secured by the States and not by the United States. Jurisdiction as applied to the General Government embraces international relations; as ap-

plied to the State, it refers simply to its power over persons and things within its particular limits.

These considerations lead to the conclusion that the rule in respect of citizenship of the United States prior to the Fourteenth Amendment differed from the English common law rule in vital particulars, and, among others, in that it did not recognize allegiance as indelible, and in that it did recognize an essential difference between birth during temporary, and birth during permanent, residence. If children born in the United States were deemed presumptively and generally citizens, this was not so when they were born of aliens whose residence was merely temporary, either in fact, or in point of law.

Did the Fourteenth Amendment impose the original English common law rule as a rigid rule on this country?

Did the amendment operate to abridge the treaty-making power, or the power to establish an uniform rule of naturalization?

I insist that it cannot be maintained that this Government is unable through the action of the President, concurred in by the Senate, to make a treaty with a foreign government providing that the subjects of that government, although allowed to enter the United States, shall not be made citizens thereof, and that their children shall not become such citizens by reason of being born therein.

A treaty couched in those precise terms would not be incompatible with the Fourteenth Amendment, unless it be held that that amendment has abridged the treaty-making power.

Nor would a naturalization law excepting persons of a certain race and their children be invalid, unless the amendment has abridged the power of naturalization. This cannot apply to our colored fellow-citizens, who never were aliens — were never beyond the jurisdiction of the United States.

"Born in the United States, and subject to the jurisdiction thereof," and "naturalized in the United States, and subject to the jurisdiction thereof," mean born or naturalized under such circumstances as to be completely subject to that jurisdiction, that is, as completely as citizens of the United States,

who are of course not subject to any foreign power, and can of right claim the exercise of the power of the United States on their behalf wherever they may be. When, then, children are born in the United States to the subjects of a foreign power, with which it is agreed by treaty that they shall not be naturalized thereby, and as to whom our own law forbids them to be naturalized, such children are not born so subject to the jurisdiction as to become citizens, and entitled on that ground to the interposition of our Government, if they happen to be found in the country of their parents' origin and allegiance, or any other.

Turning to the treaty between the United States and China, concluded July 28, 1868, the ratifications of which were exchanged November 23, 1869, and the proclamation made February 5, 1870, we find that, by its sixth article, it was provided: "Citizens of the United States visiting or residing in China shall enjoy the same privileges, immunities or exemptions in respect of travel or residence as may there be enjoyed by the citizens or subjects of the most favored nation. And, reciprocally, Chinese subjects residing in the United States shall enjoy the same privileges, immunities and exemptions in respect to travel or residence as may there be enjoyed by the citizens or subjects of the most favored nation. But nothing herein contained shall be held to confer naturalization on the citizens of the United States in China, nor upon the subjects of China in the United States."

It is true that in the fifth article, the inherent right of man to change his home or allegiance was recognized, as well as "the mutual advantage of the free migration and emigration of their citizens and subjects, respectively, from the one country to the other, for the purposes of curiosity, of traffic, or as permanent residents."

All this, however, had reference to an entirely voluntary emigration for these purposes, and did not involve an admission of change of allegiance unless both countries assented, but the contrary according to the sixth article.

By the convention of March 17, 1894, it was agreed "that Chinese laborers or Chinese of any other class, either perma-

nently or temporarily residing within the United States, shall have for the protection of their persons and property all rights that are given by the laws of the United States to citizens of the most favored nation, excepting the right to become naturalized citizens."

These treaties show that neither Government desired such change nor assented thereto. Indeed, if the naturalization laws of the United States had provided for the naturalization of Chinese persons, China manifestly would not have been obliged to recognize that her subjects had changed their allegiance thereby. But our laws do not so provide, and, on the contrary, are in entire harmony with the treaties.

I think it follows that the children of Chinese born in this country do not, *ipso facto*, become citizens of the United States unless the Fourteenth Amendment overrides both treaty and statute. Does it bear that construction; or rather is it not the proper construction that all persons born in the United States of parents permanently residing here and susceptible of becoming citizens, and not prevented therefrom by treaty or statute, are citizens, and not otherwise?

But the Chinese under their form of government, the treaties and statutes, cannot become citizens nor acquire a permanent home here, no matter what the length of their stay may be. Wharton Confl. Laws, § 12.

In *Fong Yue Ting* v. *United States*, 149 U. S. 698, 717, it was said in respect of the treaty of 1868: "After some years' experience under that treaty, the Government of the United States was brought to the opinion that the presence within our territory of large numbers of Chinese laborers, of a distinct race and religion, remaining strangers in the land, residing apart by themselves, tenaciously adhering to the customs and usages of their own country, unfamiliar with our institutions, and apparently incapable of assimilating with our people, might endanger good order, and be injurious to the public interests; and therefore requested and obtained from China a modification of the treaty."

It is not to be admitted that the children of persons so situated become citizens by the accident of birth. On the con-

trary, I am of opinion that the President and Senate by treaty, and the Congress by naturalization, have the power, notwithstanding the Fourteenth Amendment, to prescribe that all persons of a particular race, or their children, cannot become citizens, and that it results that the consent to allow such persons to come into and reside within our geographical limits does not carry with it the imposition of citizenship upon children born to them while in this country under such consent, in spite of treaty and statute.

In other words, the Fourteenth Amendment does not exclude from citizenship by birth children born in the United States of parents permanently located therein, and who might themselves become citizens; nor, on the other hand, does it arbitrarily make citizens of children born in the United States of parents who, according to the will of their native government and of this Government, are and must remain aliens.

Tested by this rule, Wong Kim Ark never became and is not a citizen of the United States, and the order of the District Court should be reversed.

I am authorized to say that MR. JUSTICE HARLAN concurs in this dissent.

MR. JUSTICE McKENNA, not having been a member of the court when this case was argued, took no part in the decision.